# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civ. A. No. 1:09-11156-JLT ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; ERIC K. SHINSEKI, Secretary of the United States Department of Veterans Affairs; and the UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

TONY WEST
Assistant Attorney General

MICHAEL K. LOUCKS
Acting United States Attorney

ARTHUR R. GOLDBERG
Assistant Director, Federal Programs Branch

STEVEN Y. BRESSLER D.C. Bar #482492
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone:    (202) 305-0167
Facsimile:    (202) 318-7609
Steven.Bressler@usdoj.gov

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND. ................................................................................................................. 5

I.      The Defense of Marriage Act ................................................................................. 5

II.     The Federal Programs Involved Here. ................................................................... 6

      A.      The Medicaid Program and Federal Financial Participation ...................... 6

      B.      The State Cemetery Grants Program ........................................................... 9

ARGUMENT. ..................................................................................................................... 10

I.      DOMA, AS APPLIED TO MASSACHUSETTS, DOES NOT
        VIOLATE THE TENTH AMENDMENT ............................................................. 10

      A.      DOMA Does Not Violate The Tenth Amendment By Imposing
                Limits On Federal Funding Programs In Which Massachusetts
                Participates ................................................................................................. 10

      B.      DOMA's Effect Upon Tax Code Provisions That Regulate The
                Commonwealth "As An Employer" Does Not Intrude On Its
                Sovereignty Or Violate The Tenth Amendment. ...................................... 14

II.     DOMA, AS APPLIED TO MASSACHUSETTS THROUGH
        FEDERAL FUNDING PROGRAMS, DOES NOT VIOLATE
        THE SPENDING CLAUSE ................................................................................... 15

      A.      The Spending Clause Affords Congress Wide Latitude To
                Legislate In Furtherance Of Broad Policy Objectives ............................. 15

      B.      DOMA Does Not Compel Massachusetts To Infringe Upon
                The Equal Protection Rights Of Its Citizens. .......................................... 16

      C.      DOMA Does Not Place Any Impermissible Non-Germane
                "Conditions" On Federal Financial Assistance To Massachusetts. ........ 17

      D.      To The Extent DOMA Is Viewed As A Non-Programmatic
                Spending Condition It Is A Permissible, Cross-Cutting Condition. ....... 21

i

E.      Because DOMA Is Consistent With Prevailing Equal Protection
        Law, It Does Not Impose Any Unconstitutional Condition ................................ 23

        1.      There Is No Fundamental Right To Federal Benefits Based
                On Marital Status. ...................................................................................... 25

        2.      Under First Circuit Law, DOMA Does Not Rest On Any
                Recognized Suspect Classification . ........................................................... 28

        3.      DOMA Satisfies Rational Basis Review. .................................................. 28

III.    MASSACHUSETTS' ALLEGATIONS THAT IT "RISKS" SPECULATIVE
        FUTURE HARM UNDER DOMA DO NOT SUPPORT ARTICLE III
        STANDING. ................................................................................................................ 32

CONCLUSION. ........................................................................................................................ 35

## TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE(S)**

Abbott, III v. United States,
    144 F.3d 1 (1st Cir. 1998). ................................................................. 33

Adarand Constructors, Inc. v. Pena,
    515 U.S. 200 (1995). ........................................................................ 28

Alfred L. Snapp & Son, Inc. v. Puerto Rico,
    458 U.S. 592 (1982). ........................................................................ 17

Auer v. Robbins,
    519 U.S. 452 (1997). ........................................................................ 14

Baehr v. Lewin,
    852 P.2d 44 (Haw. 1993). ................................................................... 5

Barbour v. Washington Metro. Area Trans. Auth.,
    374 F.3d 1161 (D.C. Cir. 2004). .......................................................... 18

Bell v. New Jersey,
    461 U.S. 733 (1983). ........................................................................ 12

Benning v. Georgia,
    391 F.3d 1299 (11th Cir. 2004). .......................................................... 23

Berner v. Delahanty,
    129 F.3d 20 (1st Cir. 1997). ............................................................... 32

Bishop v. Oklahoma,
    447 F. Supp. 2d 1239 (N.D. Okla. 2006). ................................................ 25

Bolling v. Sharpe,
    347 U.S. 497 (1954). ........................................................................ 28

Bowen v. Massachusetts,
    487 U.S. 879 (1988). ...................................................................... 7, 8

Butler v. Apfel,
    144 F.3d 622 (9th Cir.1998). .............................................................. 30

Califano v. Gautier Torres,
    435 U.S. 1 (1978). .......................................................................... 25

Campos v. INS,
       961 F.2d 309 (1st Cir. 1992). ............................................................. 26

City of Los Angeles v. Lyons,
       461 U.S. 95 (1983). ................................................................... 14, 34

Constantine v. Rectors and Visitors of George Mason University,
       411 F.3d 474 (4th Cir. 2005). ............................................................ 22

Cook v. Gates,
       528 F.3d 42 (1st Cir. 2008). ............................................................. 28

Cournoyer v. Massachusetts Bay Transp. Auth.,
       744 F.2d 208 (1st Cir. 1984). ........................................................... 23

Cutter v. Wilkinson,
       423 F.3d 579 (6th Cir. 2005). ....................................................... 23, 31

DeShaney v. Winnebago County Dep't of Soc. Servs.,
       489 U.S. 189 (1989). ................................................................... 27

FCC v. Beach Communications, Inc.,
       508 U.S. 307 (1993). ................................................................... 29

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,
       528 U.S. 167 (2000). ................................................................... 32

Fry v. United States,
       421 U.S. 542 (1975). ................................................................... 10

Garcia v. San Antonio Metro. Transit Auth.,
       469 U.S. 528 (1985). ............................................................... 13, 14

Garrett v. University of Alabama at Birmingham Bd. of Trustees,
       344 F.3d 1288 (11th Cir. 2003). ......................................................... 22

Gill, et al., v. Office of Personnel Management, et al.,
       Civ. No. 1:09-10309-JLT (D. Mass.). ..................................................... 17

Goodridge v. Dep't of Pub. Health,
       798 N.E.2d 941 (Mass. 2003). ........................................................... 24

Heller v. Doe,
       509 U.S. 312 (1993). ................................................................... 28

Ivanhoe Irrigation Dist. v. McCracken,
    357 U.S. 275 (1958)..................................................................... 18

Jeneski v. City Of Worcester,
    476 F.3d 14 (1st Cir. 2007)........................................................... 29

Jim C. v. U.S.,
    235 F.3d 1079 (8th Cir. 2000). ..................................................... 19

Kansas v. United States,
    214 F.3d 1196 (10th Cir. 2000). ............................................. passim

Kerrigan v. Comm'r of Pub. Health,
    957 A.2d 407 (Conn. 2008). .......................................................... 24

Kowalski v. Tesmer,
    543 U.S. 125 (2004)....................................................................... 17

Lau v. Nichols,
    414 U.S. 563 (1974)........................................................... 19, 20, 22

Lawrence v. Texas,
    539 U.S. 558 (2003)....................................................................... 31

In re Levenson,
    560 F.3d 1145 (9th Cir. Jud. Council 2009). ................................ 25

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992)....................................................................... 32

Lyng v. Automobile Workers,
    485 U.S. 360 (1987).................................................................. 17, 27

Martinez v. County of Monroe,
    50 A.D.3d 189 (N.Y. App. Div. 2008). ........................................ 24

Massachusetts v. EPA,
    549 U.S. 497 (2007)....................................................................... 30

Massachusetts v. Mellon,
    262 U.S. 447 (1923)....................................................................... 17

Massachusetts v. United States,
    435 U.S. 444 (1978)....................................................................... 18

McConnell v. FEC,
    540 U.S. 93 (2003)............................................................................. 11

McInnis-Misenor v. Me. Med. Ctr.,
    319 F.3d 63 (1st Cir. 2003)............................................................. 34

Medeiros v. Vincent,
    431 F.3d 25 (1st Cir. 2005)............................................................. 30

Montalvo-Huertas v. Rivera-Cruz,
    885 F.2d 971 (1st Cir. 1989)........................................................... 23

National Foreign Trade Council v. Natsios,
    181 F.3d 38 (1st Cir. 1999)............................................................. 13

New State Ice Co. v. Liebmann,
    285 U.S. 262 (1932)......................................................................... 2

New York v. United States,
    505 U.S. 144 (1992)................................................................. passim

Nieves-Marquez v. Puerto Rico,
    353 F.3d 108 (1st Cir. 2003)........................................................... 18

Nordlinger v. Hahn,
    505 U.S. 1 (1992)............................................................................ 29

Oklahoma v. Civil Serv. Comm'n,
    330 U.S. 127 (1947)....................................................................... 22

Oklahoma v. Schweiker,
    655 F.2d 401 (D.C. Cir. 1981)................................................... 13, 18

Padavan v. United States,
    82 F.3d 23 (2d Cir. 1996)............................................................... 13

Pagan v. Calderon,
    448 F.3d 16 (1st Cir. 2006)............................................................. 32

Printz v. United States,
    521 U.S. 898 (1997)............................................................ 11, 13, 16

R.J. Reynolds Tobacco Co. v. Shewry,
    423 F.3d 906 (9th Cir. 2005)........................................................... 19

Reno v. Condon,
     528 U.S. 141 (2000)..................................................................................... 14

Reno v. Flores,
     507 U.S. 292 (1993)..................................................................................... 27

Rio Grande Community Health Center, Inc. v. Rullan,
     397 F.3d 56 (1st Cir. 2005). .......................................................................... 6

SEC v. Chenery Corp.,
     332 U.S. 194 (1947)..................................................................................... 30

Sabri v. U.S.,
     541 U.S. 600 (2004)................................................................................ 22, 32

Schweiker v. Hogan,
     457 U.S. 569 (1982)..................................................................................... 21

Shaw v. Digital Equip. Corp.,
      82 F.3d 1194 (1st Cir. 1996). ...................................................................... 33

Shaw v. Oregon Pub. Employees' Retirement Bd.,
     887 F.2d 947 (9th Cir. 1989). ...................................................................... 29

Smelt v. County of Orange,
     374 F. Supp. 2d 861 (C.D. Cal. 2005), vacated on other grounds,
     447 F.3d 673 (9th Cir. 2006). ...................................................................... 25

Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield,
     907 F.2d 239 (1st Cir. 1990). ...................................................................... 29

South Carolina v. Baker,
     485 U.S. 505 (1988).............................................................................. 14, 15

South Dakota v. Dole,
     483 U.S. 203 (1987)........................................................................... passim

Suter v. Artist,
     503 U.S. 347 (1992).............................................................................. 15, 20

Toledo v. Snchez,
     454 F.3d 24 (1st Cir. 2006)..................................................................... 25, 26
Travis v. Reno,
     163 F.3d 1000 (7th Cir. 1998). .................................................................... 15

United States v. Am. Library Ass'n,
    539 U.S. 194 (2003) ........................................................................... 15

United States v. Bongiorno,
    106 F.3d 1027 (1st Cir. 1997) ......................................................... 14

United States v. Deters,
    143 F.3d 577 (10th Cir. 1998) ......................................................... 26

United States v. Lipscomb,
    299 F.3d 303 (5th Cir. 2002) ........................................................... 23

United States v. Phelps,
    17 F.3d 1334 (10th Cir. 1994) ......................................................... 29

Varnum v. Brien,
    763 N.W.2d 862 (Iowa 2009) ........................................................... 24

Washington v. Glucksberg,
    521 U.S. 702 (1997) ................................................................ 26, 27, 28

Wayte v. United States,
    470 U.S. 598 (1985) ........................................................................... 28

Weinberger v. Wiesenfeld,
    420 U.S. 636 (1975) ........................................................................... 28

West Virginia v. U.S. Dept. Of Health & Human Serv.,
    289 F. 3d 281 (4th Cir. 2002) ........................................................... 22

Wilder v. Virginia Hosp. Ass'n,
    496 U.S. 498 (1990) ............................................................................. 6

Williams v. Attorney Gen. of Ala.,
    378 F.3d 1232 (11th Cir. 2004) ....................................................... 26

Wilson v. Ake,
    354 F. Supp. 2d 1298 (M.D. Fla. 2005) .......................................... 25

## STATUTES

1 U.S.C. § 7 ................................................................................... passim

26 U.S.C. § 3402 ............................................................................... 14

28 U.S.C. § 1738C. .................................................................................................... 5, 24

38 U.S.C. § 101(31). ................................................................................................... 10

38 U.S.C. § 2408(a)(1)(A). ......................................................................................... 9, 33

38 U.S.C. § 2408(b)(3). ............................................................................................... 33

42 U.S.C. 1315(a). ..................................................................................................... 7

42 U.S.C. §§ 1316(e), 1396c. ..................................................................................... 8

42 U.S.C. § 1316(e). ................................................................................................... 8

42 U.S.C. § 1396 et seq. ............................................................................................. 6

42  U.S.C. § 1396a(a). ................................................................................................ 6, 7, 8

42 U.S.C. §§ 1396a(17), 1396r-5. ............................................................................. 21

42 U.S.C. § 1396b(a)(1). ............................................................................................ 6, 7, 8, 33

42 U.S.C. § 1396c. ..................................................................................................... 8, 9

42 U.S.C. § 2000d. ..................................................................................................... 22

42 U.S.C. § 2000d-7. ................................................................................................. 22

Pub. L. No. 95-476, Title II, § 202(b)(1), 92 Stat. 1504 (October 18, 1978). ............. 9

Pub. L. No. 104-199, 110 Stat. 2419 (1996). ............................................................. 5

## RULES AND REGULATIONS

26 C.F.R. § 31.3121(a)(2)--1(c) ................................................................................. 14

38 C.F.R. § 39.5(a) ..................................................................................................... passim

38 C.F.R. § 39.18(a) ................................................................................................... 9

42 C.F.R. §§ 430.0 et seq. ........................................................................................... 6

42 C.F.R. § 430.35. ......................................................................................... 8

42 C.F.R. § 430.42. ......................................................................................... 8

42 C.F.R. §§ 430.42(b), 430.60. ..................................................................... 8

42 C.F.R. § 433.10. ......................................................................................... 6

42 C.F.R. § 433.15. ......................................................................................... 6

## UNITED STATES CONSTITUTION

Spending Clause, Art. I, § 8, cl. 1. ....................................................... passim

Fifth Amendment. .............................................................................. passim

Tenth Amendment. ............................................................................. passim

Fourteenth Amendment. ................................................................... 4, 16, 26

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 10(c). ...................................................................... 33

## LEGISLATIVE MATERIAL

H.R. Rep. No. 104-664, reprinted in 1996 U.S.C.C.A.N. 2905............................................. 5, 31

House Comm. on Ways and Means, 2004 Green Book, 108th Cong.,
   2d Sess. 15-26 -- 15-70 (Comm. Print 2004)........................................ 6

## MASS. GEN. LAWS

M.G.L. ch. 118E, § 9............................................................................. 7

M.G.L. ch. 118E, § 61........................................................................... 8, 12

130 Mass. Code Regs. § 501.002............................................................ 7

**MISCELLANEOUS**

American Academy of Pediatrics,
http://aappolicy.aappublications.org/cgi/content/full/pediatrics;109/2/339
(February 2002 policy statement). ......................................................................... 31

American Psychological Association, http://www.apa.org/pi/lgbc/policy/ parents.html
(July 2004 policy statement). ................................................................................ 31

American Academy of Child and Adolescent Psychiatry,
http://www.aacap.org/cs/root/policy_statements/gay_lesbian_transgender_and_
bisexual_parents_policy_statement (June 1999 policy statement). ............................................ 31

American Medical Association, http://www.ama-assn.org/ama/pub/about-ama/our-
people/member-groups-sections/ glbt-advisory-committee/ama-policy-regarding-sexual-
orientation.shtml (AMA Policy Regarding Sexual Orientation)................................................. 31

Black's Law Dictionary 972 (6th ed. 1990). .................................................................. 6

Child Welfare League of America, http://www.cwla.org/ programs/culture/glbtqposition.htm
(Position Statement on Parenting of Children by Lesbian, Gay, and Bisexual Adults).............. 31

HB 436, An Act Relative to Civil Marriage & Civil Unions, 2009 N.H. Laws ch. 59............... 24

LD 1020, An Act To End Discrimination in Civil Marriage & Affirm
Religious Freedom, 2009 Me. Legis. Serv. ch. 82 (West). ..................................................... 24

S. 115, An Act to Protect Religious Freedom & Recognize Equality in
Civil Marriage, 2009 Vt. Acts & Resolves no. 3. ................................................................. 24

**INTRODUCTION**

Plaintiff, the Commonwealth of Massachusetts, challenges the constitutionality of section 3 of the Defense of Marriage Act ("DOMA").  The Commonwealth claims that DOMA violates the Tenth Amendment and the Spending Clause, Art. I, § 8, cl. 1, when it is applied to certain federal funding programs in which the Commonwealth participates.  Specifically, the Commonwealth alleges that it is denied some federal matching funds under federal Medicaid law because of DOMA and that it also may lose federal grants it received to fund state veterans' cemeteries.  It further alleges that DOMA and such denials (or possible future denials) of federal funding, as well as tax code provisions that are affected by DOMA and that regulate plaintiff as an employer, violate the Tenth Amendment because they intrude on core areas of state sovereignty.  The Commonwealth asserts that DOMA's impact on federal Medicaid matching funds and its potential impact on veterans' cemetery grants provided to the State violate the Spending Clause because the relevant federal funding restrictions induce the Commonwealth to violate the Equal Protection Clause of the Fourteenth Amendment and lack a sufficient "nexus" with the programs funded.  As set forth below, binding precedent requires that this Court find that section 3 of DOMA does not violate either the Tenth Amendment or the Spending Clause.

As the President has stated previously, this Administration does not support DOMA as a matter of policy, believes that it is discriminatory, and supports its repeal.  Consistent with the rule of law, however, the Department of Justice has long followed the practice of defending federal statutes as long as reasonable arguments can be made in support of their constitutionality, even if the Department disagrees with a particular statute as a policy matter, as it does here.[1]

---

[1]    This longstanding and bipartisan tradition accords the respect appropriately due to a co-equal branch of government and ensures that subsequent administrations will faithfully defend laws with which they may disagree on policy grounds.

Congress passed DOMA in 1996, at a time when States and their citizens were just beginning to address the legal status of same-sex marriage.  Since that time, six States including Massachusetts have enacted statutes or issued court decisions that permit (or will soon permit) same-sex marriage, and forty States have promulgated statutes or constitutional amendments that define marriage as between a man and a woman.  DOMA reflects Congress's response to this still-evolving debate among the States regarding same-sex marriage.

Consistent with our federal system, which allows each State to design its own policies, see New State Ice Co. v. Liebmann, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting), DOMA does not address whether a same-sex couple may marry within the United States.  Instead, it permits each State to decide that question for itself.  Section 3 of DOMA, in turn, addresses the effect of new state understandings of marriage on federal programs that presently tie eligibility for certain benefits to marital status.

Congress has long conferred various financial and other benefits on the basis of marriage. When States began to consider allowing gay and lesbian couples to marry, Congress effectively adopted the status quo.  It codified, for purposes of federal law, a definition of marriage that all fifty States had adopted (i.e., the union of a man and a woman) and continued to accord financial and other benefits on the basis of that understanding.

DOMA -- like all federal statutes -- is entitled to a presumption of constitutionality.  Even without such a presumption, however, Massachusetts' Tenth Amendment and federalism arguments are unavailing.  The Commonwealth asserts that "Congress lacks the authority under Article I of the United States Constitution to regulate the field of domestic relations, including marriage."  Compl. ¶ 84.  But Congress has not regulated marriage, or in any way interfered with or undermined Massachusetts' authority to allow its gay and lesbian citizens to marry.  Same-sex

2

couples are able to legally marry in Massachusetts.  Instead, Congress has decided to limit the

uses of federal funds to those that are consistent with federal law without intruding on powers

that are at the core of the States' sovereignty.   Nor does DOMA in any way unconstitutionally

"commandeer" the Commonwealth and its employees as agents of the federal government's

regulatory scheme.  DOMA does not require the State or its agents to implement any federal

scheme.  Compl. ¶ 86.  And to the extent that (preexisting) federal law requires Massachusetts to

withhold federal taxes from its employees' wages, that is an unremarkable, generally applicable

regulation of Massachusetts as an employer, not a sovereign, and does not implicate the anti-

commandeering doctrine.

Plaintiff's Spending Clause arguments also fail to state a claim upon which relief may be

granted.  First, contrary to its assertion, DOMA does not compel the Commonwealth to violate

the Fourteenth Amendment.  Massachusetts is free to use its own resources to treat married

couples however it sees fit, and need not discriminate among them when it is using only its own

resources.  DOMA only regulates how *federal* resources should be used by helping to define the

scope of federal programs that refer to marital status.  It is therefore not even a "condition" on

federal funds as that term is used in Spending Clause cases, i.e., to describe situations where

receipt of federal dollars is conditioned on the recipient doing something outside the scope of the

relevant federal program.  Even if DOMA is viewed as imposing a "condition" on these federal

programs, this condition is necessarily germane to those programs, as it defines their very scope.

And even if DOMA were viewed as a non-germane condition, it is the type of cross-cutting

condition that courts have uniformly upheld as permissible.

In all events, DOMA's distinction between same-sex and opposite-sex couples with

respect to disbursal of *federal* benefits does not violate the equal protection components of the

3

Fifth and Fourteenth Amendments under prevailing law because it does not rely on any classifications a federal court has recognized as suspect under existing precedent, nor have federal courts found a fundamental right to the marriage-based federal benefits it restricts. DOMA therefore must be analyzed under rational basis review.  Under this deferential standard, a court may not act as superlegislature, sitting in judgment on the wisdom or fairness of a legislative policy.  Instead, a legislative policy must be upheld so long as there is any reasonably conceivable set of facts that could provide a rational basis for it, including ones that Congress itself did not advance or consider.  DOMA satisfies this standard.

Congress is entitled under the Constitution to address issues of social reform on a piecemeal, or incremental, basis.  Its decision to maintain the federal status quo while preserving the ability of States to grant marriage rights to same-sex couples is rational.  Congress may subsequently decide to extend federal benefits to same-sex marriages, and this Administration believes that Congress should do so.  But its decision not to do so to this point is not irrational or unconstitutional.

Finally, the Commonwealth's claims against the Department of Veterans Affairs ("VA") and its Secretary should be dismissed for lack of subject matter jurisdiction.  The Commonwealth has not alleged any concrete or imminent injury caused by VA, merely that it *risks* loss of funds in the future *if* a same-sex spouse is buried at a state-owned veterans' cemetery that has received a federal grant.  To the extent the Commonwealth's claims against the Department of Health and Human Services ("HHS") and its Secretary rest on a speculative risk of future harm, they, too, should be dismissed.  The mere possibility of a future injury is insufficient to establish Article III standing.

# BACKGROUND

## I.     The Defense Of Marriage Act

In 1996, Congress enacted, and President Clinton signed into law, the Defense of

Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (1996).  Section 3 of DOMA defines the

terms "marriage" and "spouse," for purposes of federal law, to include only the union of one man

and one woman.  Specifically, it provides that:

> In determining the meaning of any Act of Congress, or of any ruling, regulation,
> or interpretation of the various administrative bureaus and agencies of the United
> States, the word "marriage" means only a legal union between one man and one
> woman as husband and wife, and the word "spouse" refers only to a person of the
> opposite sex who is a husband or wife.

1 U.S.C. § 7.

The House Judiciary Committee explained in its report that DOMA was enacted

following the decision in Baehr v. Lewin, 852 P.2d 44 (Haw. 1993), in which a plurality of the

Hawaii Supreme Court concluded that the definition of marriage under Hawaii law (as the union

of one man and one woman) might warrant heightened scrutiny under the State constitution.  See

H.R. Rep. No. 104-664, at 2, reprinted in 1996 U.S.C.C.A.N. 2905, 2906.  In response, Congress

sought both to "lay[] down clear rules" regarding what constitutes a marriage for purposes of

federal law and to "preserve[] each State's ability to decide" what should constitute a marriage

under its own laws.[2]  Id.  The Committee noted that section 3 of DOMA codifies, for purposes of

federal law, the definition of marriage set forth in "the standard law dictionary."  Id. at 29,

reprinted in 1996 U.S.C.C.A.N. at 2935 (citing Black's Law Dictionary 972 (6th ed. 1990)).

---

[2]     Section 2 of DOMA, which is codified at 28 U.S.C. § 1738C and which plaintiff
does not challenge (see Compl. ¶ 1 n.1), provides that "[n]o State . . . shall be required to give
effect to any public act, record, or judicial proceeding of any other State . . . respecting a
relationship between persons of the same sex that is treated as a marriage under the laws of such
other State."

II.     **The Federal Programs Involved Here**

A.     **The Medicaid Program And Federal Financial Participation**

The Medicaid program, established in 1965 as Title XIX of the Social Security Act, is a

cooperative federal-state public assistance program that provides federal financial participation

("FFP") (i.e., federal matching funds) to States that elect to pay for medical services on behalf of

certain needy individuals.[3]  See 42 U.S.C. § 1396 et seq.; Wilder v. Virginia Hosp. Ass'n, 496

U.S. 498, 502 (1990); Rio Grande Community Health Center, Inc. v. Rullan, 397 F.3d 56, 61 (1st

Cir. 2005).  See also 42 C.F.R. §§ 430.0 et seq. (implementing regulations); House Comm. on

Ways and Means, 2004 Green Book, 108th  Cong., 2d Sess. 15-26 -- 15-70 (Comm. Print 2004)

("Green Book") (summarizing principal features of Medicaid).  Although participation in the

Medicaid program is voluntary, once a state elects to participate, it must comply with the

requirements of the Medicaid statute and with regulations promulgated by the Secretary of Health

and Human Services ("the Secretary").  See Wilder, 496 U.S. at 502.

To qualify for FFP, a participating State must submit to the Secretary, and have approved,

a state "plan for medical assistance" that describes the nature and scope of the state program.  42

U.S.C. § 1396a(a).  If the state plan is approved by the Secretary, the State is thereafter eligible to

receive matching payments from the federal government of the amounts "expended . . . as

medical assistance under the State plan."  42 U.S.C. §§ 1396b(a)(1), 1396d(b).  The

---

[3]     In general, the federal government reimburses States for their Medicaid
expenditures based on a statutory formula tied to the per-capita income in each State.  Under that
formula, the federal financial participation is, at a minimum, 50% of a State's expenditures.  See
42 U.S.C. §§1396b(a)(1), 1396d(b); 42 C.F.R. § 433.10. In addition, the federal government pays
at least 50% of the costs that a State incurs in administering its Medicaid program.  See 42
U.S.C. §§1396b(a)(2)-(5), (7); 42 C.F.R. § 433.15.

Commonwealth's Medicaid medical assistance program is known as MassHealth.[4] See Compl.

¶ 46, citing MASS. GEN. LAWS ("M.G.L.") ch. 118E, § 9; 130 MASS. CODE REGS. § 501.002.

Congress has established a number of requirements that must be met in order for a state

plan for medical assistance to be approved and, therefore, for the assistance provided to be

eligible for FFP.  See generally 42 U.S.C. §§ 1396a(a)(1)-(65).  A number of those requirements,

including income and resource limitations, determine which individuals are eligible to receive

medical assistance under the state plan.  See, e.g., id. §§ 1396a(a)(10)(A)(i)(IV), (VI), (VII); see

also id. § 1396b(f).  Individuals who do not meet the applicable Medicaid eligibility

requirements, either by reason of their income levels or for other reasons, are not eligible for

federal benefits under Medicaid.  Congress has not authorized the payment of FFP to reimburse

states for care provided to individuals who are not eligible for Medicaid under an approved state

plan.[5]  See 42 U.S.C. §§ 1396b(a)(1), 1396d(b).

An individual's status as a "spouse," as that term is defined under federal law, may be

---

[4]     Pursuant to 42 U.S.C. § 1315(a), the Secretary has approved the Commonwealth's application to operate a Medicaid demonstration project under which some statutory requirements for state plans have been waived and certain demonstration costs that would not otherwise be eligible for FFP are regarded as eligible.  Documents related to CMS's approval of the Commonwealth's demonstration project application are available at http://www.cms.hhs.gov/MedicaidStWaivProgDemoPGI/downloads/Massachusetts%20MassHealth%20Current%20Approval%20Documents.pdf.  None of the waivers included in the MassHealth demonstration project alter the relevant Medicaid statutory requirements affected by DOMA.  See id.

[5]     The Center for Medicare & Medicaid Services ("CMS") does not pre-approve state expenditures.  See generally Bowen v. Massachusetts, 487 U.S. 879, 885 (1988) (describing processes for withholding FFP and disallowing claims).  Rather, the Secretary may prospectively withhold FFP after a formal finding that a State's administration of its Medicaid plan does not "substantially comply" with federal requirements.  See 42 U.S.C. § 1396c, 42 C.F.R. § 430.35, Bowen, 487 U.S. at 885.  The Secretary also may retrospectively "disallow" claims for any item or class of items she believes does not justify FFP.  See 42 U.S.C. § 1316(e), 42 C.F.R. § 430.42, Bowen, 487 U.S. at 885.  A State may seek administrative review of such decisions.  See 42 U.S.C. §§ 1316(e), 1396c; 42 C.F.R. §§ 430.42(b), 430.60.

relevant to that individual's eligibility for *federal* medical assistance under a Medicaid state plan such as MassHealth.  For example, with regard to determining income, a "State plan for medical assistance must . . . include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which . . . do not take into account the financial responsibility of any individual for any applicant or recipient of assistance under the plan unless such applicant or recipient is such individual's spouse or such individual's child who is under age 21 . . . ."  See 42 U.S.C. § 1396a(a)(17).

Under Massachusetts law, however, and "[n]otwithstanding the unavailability of federal financial participation, no person who is recognized as a spouse under the laws of the commonwealth shall be denied benefits that are otherwise available under [MassHealth] . . . due to the provisions of 1 U.S.C. § 7 or any other federal non-recognition of spouses of the same sex."  M.G.L. ch. 118E, § 61; see Compl. ¶ 56.  The Commonwealth provides such benefits using its own funds.  In accord with DOMA, Massachusetts may not provide *federal* FFP funds to certain persons who are not "spouses" under federal law, but that restriction in no way affects Massachusetts's ability to make use of its own funds as it sees fit.

Massachusetts also implies (Compl. ¶ 58) that there is something constitutionally dubious about DOMA's effect on the federal government's cost-sharing program under Medicaid. Federal funding may be withheld from a state Medicaid agency if, after notice and an opportunity for a hearing, the Secretary finds that the state program is not in substantial compliance with the Medicaid statute.  See 42 U.S.C. § 1396c.  Notably, however, the Commonwealth has not alleged that it has been subject to any such compliance procedures based on DOMA, or that it has lost FFP based on a finding of substantial noncompliance.  See, e.g., Compl. ¶¶ 46-62.

B.     The State Cemetery Grants Program

Congress established the State Cemetery Grants Program for veterans in 1978 to complement the national cemetery system.   See Pub. L. No. 95-476, Title II, § 202(b)(1), 92 Stat. 1504 (October 18, 1978).   Under this program, VA may, inter alia, provide up to 100 percent of the cost of development associated with the establishment, expansion, or improvement of a veterans' cemetery owned by a state.  38 U.S.C. § 2408(a)(1)(A).  VA may also fund an operation and maintenance project to assist a State in meeting VA's national shrine standards at such cemeteries.  Id. § 2408(a)(1)(B).

VA is "entitled," but not required, to recover any grant funds paid to a State for establishment, expansion, or improvement of a particular state veterans' cemetery if the State "ceases to operate such cemetery as a veterans' cemetery, or uses any part of the funds provided through such grant for a purpose other than that for which the grant was made."  See 38 U.S.C. § 2408(b)(3).  Whether to recover such funds is committed to VA's discretion.  See id.; see also 38 C.F.R. § 39.18(a) (providing for recovery of grant funds if the state veterans' cemetery is not operated in accordance with 38 C.F.R. § 39.5(a)).  To be considered a qualifying veterans' cemetery for purposes of VA's State Cemetery Grants Program, a state veterans' cemetery must be "operated solely for the interment of veterans, their spouses, surviving spouses," and certain children.  38 C.F.R. § 39.5(a).[6]  The Commonwealth has not alleged that VA has denied, recovered or sought to recover any grant funds based on application of DOMA to this program in Massachusetts.  See, e.g., Compl. ¶¶ 63-79.

---

[6]     Federal law (enacted prior to DOMA) defines the terms "spouses" and "surviving spouses" for purposes of veterans benefits in a manner that would not include a same-sex married partner.  See 38 U.S.C. § 101(31) ("The term 'spouse' means a person of the opposite sex who is a wife or husband."); id. § 101(3) (consistent definition of "surviving spouse").

**ARGUMENT**

I.  **DOMA, AS APPLIED TO MASSACHUSETTS, DOES NOT VIOLATE THE TENTH AMENDMENT**

Plaintiff alleges that 1 U.S.C. § 7, as applied through federal laws governing Medicaid matching payments to States, state cemetery grant funding, and tax provisions regulating employers, violates the Tenth Amendment because it regulates marriage, a traditional subject of state sovereignty, and because it commandeers the Commonwealth to enforce a federal regulatory scheme and enforce federal policy.  Plaintiff is incorrect: the challenged federal funding limits, as applied to plaintiff because of DOMA, are consistent with the Tenth Amendment under well-established principles.

A.  **DOMA Does Not Violate The Tenth Amendment By Imposing Limits On Federal Funding Programs In Which Massachusetts Participates**

The Tenth Amendment affirms that "'[t]he States unquestionably do retain a significant measure of sovereign authority,'" New York v. United States, 505 U.S. 144, 156-57 (1992) (citation omitted), as it "expressly declares the Constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system," Fry v. United States, 421 U.S. 542, 547 n.7 (1975).  Faced with a contention that Congress has exceeded limits imposed on its authority by the Tenth Amendment, the question for the Court is whether Congress has intruded upon the "core of sovereignty retained by the States" under the Constitution.  New York, 505 U.S. at 159.

"In examining congressional enactments for infirmity under the Tenth Amendment, th[e] [Supreme] Court has focused its attention on laws that commandeer the States and state officials in carrying out federal regulatory schemes." McConnell v. FEC, 540 U.S. 93, 186 (2003).  In New York, for example, the Supreme Court struck down legislation that directed the States either

10

to regulate the disposal of radioactive waste generated within their borders, in accordance with federal standards, or to take title to it.  505 U.S. at 174-77.  The Court concluded that this provision "'commandeer[ed] the legislative processes of the States *by directly compelling them to enact and enforce a federal regulatory program.*'"  Id. at 176 (emphasis added, citation omitted).  In so doing, the statute "crossed the line" distinguishing permissible "encouragement" to the States to adopt a particular policy from "coercion" or "commandeer[ing]," an attempted exercise of direct legal authority over the legislative and administrative processes of the States that had been denied to Congress by the framers of the Constitution.  Id. at 175; see id. at 161-66.  Thus, it "infring[ed] upon the core of state sovereignty reserved by the Tenth Amendment."  Id. at 177.

Similarly, in Printz v. United States, 521 U.S. 898 (1997), the Supreme Court held that provisions of the Brady Act, imposing an unconditional legal obligation on state law enforcement officials to conduct background checks on prospective handgun purchasers, violated the residual sovereignty of the States protected by the Tenth Amendment, because "'[t]he Federal Government may not compel the States to enact or administer a federal regulatory program.'"  Id. at 933 (citation omitted); see id. at 919-20.

New York and Printz are inapposite here.  DOMA's effect on the federal programs identified by the Commonwealth does not present an "unavoidable command" to state governments "to implement legislation enacted by Congress."  New York, 505 U.S. at 176, 185. DOMA defines the words "marriage" and "spouse" for purposes of federal law only.  1 U.S.C. § 7.  It does not regulate who may marry; that question remains the subject of the States' regulation, and same-sex couples are entitled to equal marriage rights under Massachusetts law. The Medicaid statute and the State Cemetery Grants Program, as applied in light of DOMA,

11

present the States not with a command but a choice: to use federal matching funds or grants for the purposes Congress has specified in authorizing such grants or to forgo those funds.  The States' "options [are] increased, not constrained, by the offer of more federal dollars."  See Kansas v. United States, 214 F.3d 1196, 1203-4 (10th Cir. 2000).  Indeed, in New York, the Supreme Court expressly distinguished conditional exercises of Congress's spending authority, even to "influenc[e] a State's policy choices," from the "unavoidable command" of the "take title" provision that it condemned in that case as "coercion."  505 U.S. at 166, 175-76, 185.

The States' options are evident from Massachusetts' own actions with respect to MassHealth:  Massachusetts has enacted a law to provide benefits to same-sex spouses even when federal Medicaid matching funds are unavailable due to DOMA.  See M.G.L. ch. 118E, § 61.  This belies any contention that the Commonwealth has no choice but to alter its program to comply with federal requirements.  Massachusetts has not been "commandeered"; Congress has decided not to fund the Commonwealth's decision to afford Medicaid benefits to persons who are not eligible for those benefits under federal law.

Here, of course, the extension of federal funding only to uses consistent with federal Medicaid and veterans' benefits law does not even penalize other uses of state monies; it merely declines to fund them.  Courts have rejected Tenth Amendment challenges to conditions on the receipt of federal funds that require States to do much more.  See, e.g., Kansas, 214 F.3d at 1202-1203 (rejecting Tenth Amendment challenge to conditions on the receipt of certain block grants that required States to pass particular legislation; holding that in the context of a voluntary federal-state program, a State "is ultimately free to reject both the conditions and the funding, no matter how hard that choice may be."); National Foreign Trade Council v. Natsios, 181 F.3d 38, 61 (1st Cir. 1999) (affirming Tauro, J.) (rejecting Massachusetts Burma Law, despite contentions

12

that court decision interfered with purchasing decisions at the core of state sovereignty; noting "even if Massachusetts were being compelled to deal with firms that do business in Burma, such compulsion is not similar to the federal government compulsion of States found impermissible in New York and Printz."); Padavan v. United States, 82 F.3d 23, 29 (2d Cir. 1996) (rejecting claim that federal Medicaid requirement to provide emergency medical care to illegal aliens is example of federal "commandeering," noting voluntary nature of State participation in program); Oklahoma v. Schweiker, 655 F.2d 401, 414 (D.C. Cir. 1981) (holding a court may not invalidate conditions on the receipt of Medicaid funds on the theory that the amount of funding in the balance renders the State's choice illusory: "'We do not agree that the carrot has become a club because rewards for conforming have [been] increased. It is not the size of the stake that controls, but the rules of the game.'").

Again, Massachusetts faces, at most, a loss of federal funds if it uses those funds for purposes Congress has not authorized.  But dependence on federal funding cannot be taken as an attribute of State "autonomy and independence" that the Constitution is meant to preserve. Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 549-50 (1985); see Printz, 521 U.S. at 919-20.  To the contrary, the Supreme Court has held that "[r]equiring States to honor the obligations voluntarily assumed as a condition of federal funding . . . does not intrude on their sovereignty." Bell v. New Jersey, 461 U.S. 773, 790-91 (1983).

**B.      DOMA's Effect Upon Tax Code Provisions That Regulate The Commonwealth "As An Employer" Does Not Intrude On Its Sovereignty Or Violate The Tenth Amendment**

Plaintiff also complains that "[w]hen the Commonwealth acts as an employer," DOMA requires it to "collect both federal income and Medicare taxes based on the fair market value of health benefits provided to the same-sex spouse" of state employees who "include their same-sex

spouses on their health insurance plans." Compl. ¶¶ 43-44.[7]  But "a Tenth Amendment attack on

a federal statute cannot succeed" unless, inter alia, "the statute . . . regulate[s] the States as

States."  United States v. Bongiorno, 106 F.3d 1027, 1033 (1st Cir. 1997).  By the

Commonwealth's own admission, federal income and Medicare tax withholding requirements for

employers regulate the Commonwealth not as a State but "as an employer."  Compl. ¶ 43.   Such

regulation does not offend the Tenth Amendment.  See Reno v. Condon, 528 U.S. 141, 151

(2000) (upholding Drivers Privacy Protection Act because it "does not require the States in their

sovereign capacity to regulate their own citizens.  [It] regulates the States as the owners of data

bases.");  Auer v. Robbins, 519 U.S. 452, 457 (1997) (noting that, in Garcia, the Court held that

Congress's extension of Fair Labor Standards Act coverage to the States as employers was

consistent with the Tenth Amendment); South Carolina v. Baker, 485 U.S. 505, 514-15 (1988)

(upholding statute that "regulate[d] state activities" as bond-issuers, rather than "seek[ing] to

control or influence the manner in which States regulate private parties").  Moreover, while the

Commonwealth alleges these federal tax requirements "impose a burden" on its resources,

Compl. ¶ 44, such a burden also does not offend the Tenth Amendment.  "Any federal regulation

demands compliance.  That a State wishing to engage in certain activity must take administrative

and sometimes legislative action to comply with federal standards regulating that activity is a

commonplace that presents no constitutional defect."  Baker, 485 U.S. at 514-15.  See also Travis

v. Reno, 163 F.3d 1000, 1004-5 (7th Cir. 1998) ("There is just no blinking the fact that federal

---

[7]     See, e.g., 26 U.S.C. §§ 3402 (requiring employers to withhold certain taxes from employee wages), 3121(a)(2) (excluding from the Internal Revenue Code definition of "wages" premiums and benefits paid from health plan for employee or dependents); 26 C.F.R. § 31.3121(a)(2)-1(c) (defining dependents to include, inter alia, a husband or wife).  A same-sex spouse may qualify as an employee's dependent under federal law for a reason other than his or her marriage.  Id.

law pervasively regulates states as marketplace participants; the anti-commandeering rule comes into play only when the federal government calls on the states to use their sovereign powers as regulators of their citizens.").  For all of these reasons, the Commonwealth's Tenth Amendment claim fails as a matter of law.

## II.    DOMA, AS APPLIED TO MASSACHUSETTS THROUGH FEDERAL FUNDING PROGRAMS, DOES NOT VIOLATE THE SPENDING CLAUSE

### A.    The Spending Clause Affords Congress Wide Latitude To Legislate In Furtherance Of Broad Policy Objectives

The Commonwealth's Spending Clause challenge also fails to state a claim upon which relief may be granted.  The Constitution vests Congress with the power to "fix the terms under which it disburses federal money to the States."  Suter v. Artist, 503 U.S. 347, 356 (1992).  And as the Supreme Court has repeatedly recognized, Congress has "wide latitude" under the Spending Clause "'to further broad policy objectives by conditioning the receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" South Dakota v. Dole, 483 U.S. 203, 206-07 (1987) (citation omitted); United States v. Am. Library Ass'n, 539 U.S. 194, 203 (2003).  Thus, the spending power is "'not limited by the direct grants of legislative power found in the Constitution'" but can be used to achieve broad policy objectives beyond Article I's "'enumerated legislative fields.'"  Dole, 483 U.S. at 207; see also Printz v. United States, 521 U.S. 898, 936 (1997) (O'Connor, J., concurring) (contrasting impermissible command to condition on acceptance of federal funds).

In Dole, the Court did state that prior cases "have suggested (without significant elabora-tion) that conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular projects or programs," and that "other constitutional provisions may provide an independent bar to the conditional grant of federal funds."  483 U.S. at 207-08.  Plaintiff

claims that limits on the federal funding available for health care and veterans' cemeteries in

Massachusetts caused by the application of DOMA to those programs compel Massachusetts to

unconstitutionally infringe upon the equal protection rights of same-sex couples married under

Massachusetts law and are insufficiently related to the federal interests in the programs. These

claims fail under prevailing law.

### B.       DOMA Does Not Compel Massachusetts To Infringe Upon The Equal Protection Rights Of Its Citizens

The Commonwealth claims that DOMA violates the Spending Clause because it compels

the State to discriminate between same-sex and opposite-sex married couples in violation of the

Equal Protection Clause of the Fourteenth Amendment. Compl. ¶¶ 90-91. But DOMA does no

such thing.

As noted, Massachusetts enacted a law to provide benefits to same-sex spouses even

when federal Medicaid matching funds are unavailable due to DOMA. See M.G.L. ch. 118E,

§ 61. Similarly, Massachusetts has alleged that it "treats *identically* the applications of married

veterans in same-sex and different-sex relationships" and has "pre-approved the application for

burial submitted by a Massachusetts veteran and his same-sex spouse." Compl. ¶¶ 76-77

(emphasis added). These choices refute any claim that DOMA, as applied through the Medicaid

statute and State Cemetery Grants Program, "*requires* the Commonwealth to violate the Equal

Protection Clause." Id. ¶ 90 (emphasis added); id. ¶ 91 (same).

Massachusetts' real claim, therefore, is not that DOMA requires it to treat same-sex

spouses differently than opposite-sex spouses for purposes of these programs, but rather that

Congress has declined to fund the State's decision to treat individuals in these two groups

identically. Massachusetts, however, has no constitutional right to such federal funding. Cf.

Lyng v. Automobile Workers, 485 U.S. 360, 368 (1987) (a decision "not to subsidize the

exercise of a fundamental right does not infringe the right").  Thus, Congress's refusal to fund

Massachusetts' policy decision does not violate the Spending Clause.[8]

### C.     DOMA Does Not Place Any Impermissible Non-Germane "Conditions" On Federal Financial Assistance To Massachusetts

Unable to claim any right to federal funding of its policy choices, Massachusetts contends

that DOMA operates as an invalid "condition" on funding under the Medicaid statute and State

Cemetery Grants Program because "Congress may not attach conditions to the receipt of federal

funds that lack a sufficient nexus to the purpose(s) advanced by the program's implementation."

Compl. ¶ 93.  No such "nexus" requirement, however, can be found in the Spending Clause

itself, which exhorts only that federal funds be expended "to provide for the common Defence

and General Welfare."  U.S. Const., art. 1, § 8, cl. 1.  Rather, Massachusetts appears to rely on

dicta in Dole where the Supreme Court observed that prior cases "have *suggested* (without

significant elaboration) that conditions on federal grants *might* be illegitimate if they are

unrelated 'to the federal interest in particular national projects or programs.'"  483

U.S. at 207-08 (emphasis added, citations omitted); see Nieves-Marquez v. Puerto Rico, 353

---

[8]      If DOMA did violate the equal protection rights of individuals -- and, as the United States explains below, it does not, see infra, I.D. -- the State's inability to challenge that violation under the Spending Clause would not leave the violation unredressed.  Individuals themselves could challenge DOMA under the Fifth Amendment (and in fact some have, see Gill, et al., v. Office of Personnel Management, et al., Civ. No. 1:09-10309-JLT (D. Mass.)).  The Commonwealth, however, has no standing to raise a constitutional claim on behalf of its citizens. See Kowalski v. Tesmer, 543 U.S. 125, 129 (2004) (the Supreme Court has "adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" ) (citation omitted); Massachusetts v. Mellon, 262 U.S. 447, 485-86 (1923) (it is no part of a State's "duty or power to enforce their [citizens'] rights in respect of their relations with the federal government." ); see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 610 n.16 (1982) ("A State does not have standing as parens patriae to bring an action against the Federal Government.").  It cannot evade this limitation by asserting a right under the Spending Clause to use federal funds to avoid a purported violation of its citizens' equal protection rights.

F.3d 108, 128-29 (1st Cir. 2003) (listing <u>Dole</u> factors).  The Supreme Court, however, has never overturned a Spending Clause statute for lacking such a nexus.  <u>See</u> <u>Barbour v. Washington Metro. Area Trans. Auth.</u>, 374 F.3d 1161, 1168 (D.C. Cir. 2004); <u>Kansas</u>, 214 F.3d at 1200-01.[9]  Moreover, even assuming such a requirement exists, it is not violated here.  DOMA does not impose a "condition" on Massachusetts in exchange for federal funds, as the <u>Dole</u> Court used the term.

As a matter of both logic and precedent, if there is any "nexus" test on funding "conditions," it must apply to conditions that Congress attaches to federal funding and that bind the funds recipient outside the federal program, not limits to the terms that define the scope of the very program Congress chooses to fund.   Accordingly, courts "distinguish[] situations where the government imposes a direct constraint on the use of its own money from situations 'in which the Government has placed a condition on the recipient of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program.'"  <u>R.J. Reynolds Tobacco Co. v. Shewry</u>, 423 F.3d 906, 919 (9th Cir. 2005) (in a parenthetical; citation omitted).  Thus in <u>Dole</u>, for example, Congress authorized use of federal funds for highway construction and maintenance, then conditioned a State's right to receive full federal funding on enactment of a minimum drinking age.  483 U.S. at 205.  It was the requirement that States pass a minimum drinking age law -- not the requirement that federal highway funds be used for highways -- that

---

[9]        As the source of the "suggest[ion]" that conditions on federal grants "might" be illegitimate if unrelated to the federal interest in particular projects or programs, <u>Dole</u> cited <u>Massachusetts v. United States</u>, 435 U.S. 444, 461 (1978) (plurality opinion), and <u>Ivanhoe Irrigation Dist. v. McCracken</u>, 357 U.S. 275, 295 (1958).  <u>See</u> 483 U.S. at 207-08.  Yet, as observed in <u>Oklahoma v. Schweiker</u>, neither <u>Massachusetts</u> nor <u>Ivanhoe Irrigation District</u> "involved an argument that a term set by Congress was unrelated to the federal funds conditioned."  655 F.2d at 407 n. 10.

the Court suggested was a "condition" which might be subject to a "nexus" or germaneness analysis.

Here, DOMA does not operate as a "condition" on receipt of Medicaid FFP and the State Cemetery Grants Program funds that seeks to leverage the federal government's interests by controlling State behavior outside the Medicaid and state cemetery programs, i.e., "the ordinary quid pro quo that the Supreme Court has repeatedly approved." See Jim C. v. U.S., 235 F.3d 1079, 1081 (8th Cir. 2000) (citing Lau v. Nichols, 414 U.S. 563, 566-67 (1974)).  Instead, DOMA operates to define and limit the scope of programs that Congress has chosen to fund by restricting who may be included in such programs.  For example, DOMA defines the meaning of the term "spouse" that is used in the Medicaid statute to determine eligibility for Medicaid benefits, and thereby determines who may receive benefits under the Medicaid program.  Similarly, DOMA defines the meaning of the term "spouse" in the federal regulations that provide that federal grants are available for state cemeteries that are "operated solely for the interment of veterans, their spouses, [and] surviving spouses," 38 C.F.R. § 39.5(a), and in so doing governs who is eligible for this federal program.   Thus, DOMA prescribes the related use of federal funds by defining these terms and setting the boundaries of the relevant federal programs.

DOMA defines the scope of all federal programs that refer to marital status, rendering opposite-sex marital status germane to all such programs.  In Dole, the Supreme Court did not analyze whether the requirement that federal highway funds be used for highways was germane to Congress's interest in funding highways, see 483 U.S. at 209 n.3; that requirement defined the very purpose of the federal funding.  So too here, the requirement that federal funds awarded under the State Cemetery Grants Program be used for state cemeteries that are "operated solely for the interment of veterans, their [opposite-sex] spouses, [and] [their opposite-sex] surviving

19

spouses," 38 C.F.R. § 39.5(a), is necessarily germane to Congress's decision to award federal funds only to state cemeteries that are limited to the burial of such persons. Because it defines one of the features that renders a state cemetery eligible for federal funding, the "opposite-sex spouse" requirement that DOMA incorporates into the State Cemetery Grants Program is as germane and directly related to that program as the "veterans" requirement. Similarly, because Congress, by enacting DOMA, chose to make a person's status as an opposite-sex "spouse" relevant to eligibility for the federal portion of Medicaid funding, that status is necessarily germane to federal funding under the Medicaid statute.

It is for Congress, not the States, to define the purposes for which federal funding can be used. Suter v. Artist, 503 U.S. at 356 (Congress's broad latitude under the Spending Clause includes the power to "fix the terms under which it disburses federal money to the States"); Lau, 414 U.S. at 566-69 (the "Federal Government has power to fix the terms on which its money allotments to the States shall be disbursed"). Here, the "purposes" of Medicaid and veterans cemetery funds are established by the criteria that govern eligibility for those funds, and Congress has chosen to use opposite-sex spousal status as one of these criteria. DOMA therefore does not effect a non-germane "condition" on federal funds that compels Massachusetts to act a certain way; it effects a limitation on the federal programs themselves.

Massachusetts tries to obscure this direct nexus by defining the purposes of the veterans cemetery law and the Medicaid statute in broad generalities. It alleges that "Medicaid funding is given to MassHealth for the purpose of providing healthcare coverage to low- and moderate-income residents of the Commonwealth" and "[v]eterans' cemetery funding is given to [the State] for the purpose of constructing and improving cemeteries that provide a convenient burial site for military veterans and their families." See Compl. ¶¶ 94, 96. Massachusetts then

claims that DOMA's limitations on the meaning of "marriage" and "spouse" have no nexus to "the purposes advanced by these programs." Id. ¶ 98.  But implicit in the "purposes advanced by these programs," even as stated by plaintiff, are the questions of who may qualify as "low- and moderate-income residents of the Commonwealth" and which family members are eligible for burial in a veterans' cemetery.  See id.  As to the use of federal dollars, Congress has chosen to answer those questions -- and to condition eligibility for federal funds -- on the basis of opposite-sex marital status.  See, e.g., 42 U.S.C. §§ 1396a(17), 1396r-5; 38 C.F.R. § 39.5(a).

Massachusetts may believe this limitation is bad policy, and that it would be better if both the Medicaid and veterans' cemetery grant programs were expanded to include same-sex spouses.  The Commonwealth's policy disagreement, however, does not alter the fact that section 3 of DOMA is a limitation on the scope of these two statutes.  Cf. Schweiker v. Hogan, 457 U.S. 569, 589 (1982) ("A belief that an Act of Congress may be inequitable or unwise is of course an insufficient basis on which to conclude that it is unconstitutional.").  Therefore, any "condition" it imposes is necessarily germane to these federal programs for purposes of the Spending Clause.

### D.     To The Extent DOMA Is Viewed As A Non-Programmatic Spending Condition It Is A Permissible, Cross-Cutting Condition

Even if DOMA were viewed not as establishing the criteria that govern eligibility for Medicaid and veterans cemetery funding, but rather as imposing a condition on such funding, it is still permissible.  Cases uphold as valid exercises of Spending Clause authority so-called cross-cutting conditions that can apply even if there is *no* direct link to the expenditure of federal funds.  See Lau, 414 U.S. at 566-69 (holding the "Federal Government has power to fix the terms on which its money allotments to the States shall be disbursed;" finding school district violated the cross-cutting nondiscrimination requirement in 42 U.S.C. § 2000d that properly applies to recipients of funds from any federal program); Oklahoma v. U.S. Civil Service Comm'n, 330

U.S. 127, 129 n.1 (1947) (upholding across-the-board requirement in the Hatch Act that no state employee whose principal employment was connected to any activity that was financed in whole or in part by the United States could take "any active part in political management"); Constantine v. Rectors and Visitors of George Mason University, 411 F.3d 474, 492-93 (4th Cir. 2005) (upholding 42 U.S.C. § 2000d-7, requiring as a condition on receipt of federal funds that States waive their immunity from suit for violations of Title VI, the Rehabilitation Act, and other statutes, notwithstanding that § 2000d-7 is a "blanket condition that applies regardless of the nature or the amount of federal funds accepted"); Garrett v. University of Alabama at Birmingham Bd. of Trustees, 344 F.3d 1288, 1293 (11th Cir. 2003) (per curiam) (applying § 2000d-7 to state university); West Virginia v. U.S. Dept. Of Health & Human Serv., 289 F. 3d 281, 284, 293-94 (4th Cir. 2002) (federal requirement that States adopt "estate recovery" plans or lose all or part of their federal Medicaid reimbursements did not violate the Spending Clause). Whatever federal interests a particular funding program might otherwise serve, the condition imposed by application of DOMA also serves the federal interest in avoiding a use of federal funds beyond those that Congress has authorized, as well as the legitimate interests that Congress could have rationally concluded were furthered by DOMA. Cf. Sabri v. U.S., 541 U.S. 600, 605-6 (2004). Thus, like the cross-cutting spending conditions described above, the federal spending limits affected by DOMA plainly satisfy any germaneness or "nexus" test to be drawn from the Spending Clause.

Finally, federal courts have concluded that if the Supreme Court has imposed a nexus test, it is a "low-threshold" test, Cutter v. Wilkinson, 423 F.3d 579, 587 (6th Cir. 2005), of "minimum rationality." Kansas, 214 F.3d at 1199; see Benning v. Georgia, 391 F.3d 1299, 1307-08 (11th Cir. 2004); United States v. Lipscomb, 299 F.3d 303, 322 (5th Cir. 2002). This is

the standard of rational-basis scrutiny applied to economic and social welfare legislation under

substantive due process and equal protection analysis.[10]  Any spending "conditions" imposed

upon Massachusetts by DOMA satisfy this standard because, as explained below, Congress could

have rationally concluded that DOMA furthers a legitimate government interest.

> **E.    Because DOMA Is Consistent With Prevailing Equal Protection Law, It Does Not Impose Any Unconstitutional Condition**

Even if it were possible to view DOMA as imposing "conditions" on Medicaid and

veterans cemetery funding that (a) are separate and distinct from the purposes of the funding, *and*

(b) require Massachusetts to engage in conduct it would not otherwise undertake, the State's

Spending Clause challenge would still fail.  DOMA does not run afoul of the principle that

spending conditions may not violate any independent constitutional provision.[11]  Dole, 483 U.S.

at 208.  This is because DOMA itself is consistent with prevailing equal protection law in this

Circuit.

DOMA reflects what Congress believed was an appropriate response to debate within the

States over same-sex marriage.  In recent years, Massachusetts and five other States have

---

[10]    See Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971, 976 & n.7 (1st Cir. 1989) ("As a general rule, federal courts, respecting the right of local self-determination, employ the prophylaxis of the equal protection clause only to ensure the existence of some rational relationship between a challenged statute and the legitimate ends of local government."); Cournoyer v. Massachusetts Bay Transp. Auth., 744 F.2d 208, 212 (1st Cir. 1984) (discussing and applying "minimum rationality" test) (affirming Tauro, J.).

[11]    Of course, this prohibition *does not even apply* to DOMA.  The limitation described in Dole reflects "the unexceptionable proposition that the [spending] power may not be used to induce the States to engage in activities that would themselves be unconstitutional."  Id. at 210.  But as explained above, DOMA does not "induce" the Commonwealth to do anything; it merely limits the uses of federal funds to those Congress has prescribed.  Indeed, as also noted and according to Massachusetts' Complaint, the Commonwealth is treating all married couples equally.  See Compl. ¶¶ 76-77.  The Commonwealth therefore has not been induced to do otherwise.

guaranteed gay and lesbian couples the right to marry.  See Goodridge v. Dep't of Pub. Health, 798 N.E.2d 941 (Mass. 2003); HB 436, An Act Relative to Civil Marriage & Civil Unions, 2009 N.H. Laws ch. 59; LD 1020, An Act To End Discrimination in Civil Marriage & Affirm Religious Freedom, 2009 Me. Legis. Serv. ch. 82 (West); S. 115, An Act to Protect Religious Freedom & Recognize Equality in Civil Marriage, 2009 Vt. Acts & Resolves no. 3; Varnum v. Brien, 763 N.W.2d 862 (Iowa 2009); Kerrigan v. Comm'r of Pub. Health, 957 A.2d 407 (Conn. 2008).  In addition, one state -- New York -- and the District of Columbia recognize same-sex marriages performed under the laws of other jurisdictions, although neither presently issues marriage licenses to same-sex couples.  See D.C. Code § 46-405.01; Martinez v. County of Monroe, 50 A.D.3d 189 (N.Y. App. Div. 2008).  Forty other States have codified, either by statute or by constitutional amendment, a definition of marriage as the union of a man and a woman.  See Varnum, 763 N.W.2d at 878 n.5.

Anticipating this activity on the state level, DOMA codifies, for purposes of federal statutes, regulations, and rulings, the understanding of marriage as "a legal union between one man and one woman as husband and wife," see 1 U.S.C. § 7, and it preserves to each State the ability to retain that definition as its policy if the State so chooses, or to alter it, as it sees fit.  See 28 U.S.C. § 1738C.  In enacting DOMA, therefore, Congress (1) preserved the status quo in relation to the federal definition of marriage for the purposes of federal programs and benefits, while the States continued to examine and debate the subject; and (2) recognized the right of any State to allow gays and lesbians to marry while, at the same time, it permitted other States to adhere to their existing understandings of the institution.

Under rational basis review, Congress is entitled to respond to new social mores one step at a time and to adjust national policy incrementally.  DOMA reflects just such a response.  It

maintains the status quo on the national level and permits autonomy on the state level. Plaintiffs cannot overcome the "presumption of constitutionality" that DOMA, like all federal statutes, enjoys. See, e.g., Califano v. Gautier Torres, 435 U.S. 1, 5 (1978). The statute does not make a distinction based on what the federal courts have held to constitute a "suspect class," see Toledo v. Sánchez, 454 F.3d 24, 33 (1st Cir. 2006), nor have federal courts found a fundamental right to the marriage-based federal benefits that DOMA restricts. Those federal courts that have specifically addressed the constitutionality of section 3 of DOMA have upheld it against constitutional challenges.[12] Because Congress could have viewed DOMA as rationally related to legitimate governmental interests, this Court must also sustain its constitutionality against the Commonwealth's Spending Clause challenge.

### 1.     There Is No Fundamental Right To Federal Benefits Based On Marital Status

Equal protection claims are typically subject to "rational basis" review, under which the challenged statute will be upheld as long as it bears "a rational relationship to some legitimate government interest." See Campos v. INS, 961 F.2d 309, 316 (1st Cir. 1992). Only if the statute "burdens a suspect class or impinges upon a fundamental right" will it be subjected to a higher standard of review. See Toledo, 454 F.3d at 33. DOMA deprives same-sex couples of certain federal benefits that are tied to marital status. There is no fundamental right, however, to

---

[12]      See, e.g., Smelt v. County of Orange, 374 F. Supp. 2d 861 (C.D. Cal. 2005), vacated on other grounds, 447 F.3d 673 (9th Cir. 2006); Wilson v. Ake, 354 F. Supp. 2d 1298 (M.D. Fla. 2005); see also Bishop v. Oklahoma, 447 F. Supp. 2d 1239 (N.D. Okla. 2006) (rejecting certain constitutional challenges but deferring others pending further development). But cf. In re Levenson, 560 F.3d 1145, 1149 (9th Cir. Jud. Council 2009) (Reinhardt, J.) (suggesting, in his capacity as designee of the Chair of the Ninth Circuit's Standing Committee on Federal Public Defenders, that DOMA should be subject to heightened scrutiny, and finding that its denial of federal benefits to the same-sex spouse of federal employee had "no rational basis" and therefore "contravene[d] the Fifth Amendment").

marriage-based federal benefits.

A fundamental constitutional right protected by the Due Process Clause is one that is "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997). The Supreme Court has mandated extreme caution in elevating individual liberty interests, no matter how genuinely and profoundly important they may be to the parties asserting them, to the status of fundamental constitutional rights. As the Court has explained:

> By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court.

Id. at 720 (citations and internal quotation marks omitted); see Williams v. Attorney Gen. of Ala., 378 F.3d 1232, 1250 (11th Cir. 2004) (observing that conferring constitutional status on an asserted right prevents future revision through democratic process). Accordingly, only a "small number" of substantive rights qualify under the Fifth or Fourteenth Amendments as "fundamental." United States v. Deters, 143 F.3d 577, 582 (10th Cir. 1998).

A court must reach a "careful description" of the alleged right before determining whether it is fundamental. Glucksberg, 521 U.S. at 721. Most importantly, the asserted right must be defined with specificity, rather than in general terms. Only upon reaching this specific, "careful description" can a court proceed to determine whether the asserted right is fundamental.[13]

---

[13]    For example, in Washington v. Glucksberg, the right was not    properly characterized    a "right to die," but rather a "right to commit suicide." 521 U.S. at 722-23. Similarly, in Reno v. Flores, in which juvenile aliens challenged their detention by the government, the Supreme Court rejected an invitation to characterize the asserted right as

The constitutional right that the Commonwealth asserts DOMA compels it to violate is not a right to marry.  DOMA, particularly as applied through federal laws governing Medicaid matching payments to States, state cemetery grant funding, and tax provisions regulating employers, does not prohibit gay and lesbian couples from marrying, nor does it prohibit the States from acknowledging same-sex marriages.  Instead, the Commonwealth's claim that DOMA forces the State to violate the Equal Protection Clause rests on an asserted right of individuals to receive federal benefits on the basis of their marital status.  There is, however, no fundamental right to marriage-based federal benefits.  See, e.g., DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 196 (1989) (Due Process Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual"); Lyng, 485 U.S. at 368 (a decision "not to subsidize the exercise of a fundamental right does not infringe the right").  Accordingly, the fact that DOMA denies federal funding of marriage-based benefits to same-sex couples does not subject it to heightened scrutiny.

### 2.  Under First Circuit Law, DOMA Does Not Rest On Any Recognized Suspect Classification

The First Circuit has concluded that sexual orientation does not constitute a suspect classification, see Cook v. Gates, 528 F.3d 42, 62 (1st Cir. 2008),[14] and that holding is binding on

---

"freedom from physical restraint," and instead characterized it as "the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution."  507 U.S. 292, 302 (1993).

[14]    The First Circuit in Cook considered a challenge under the Fifth Amendment, which applies to the federal government, whereas the Commonwealth's claims are premised on the Equal Protection Clause of the Fourteenth Amendment, which applies to the States.  Under either Amendment, however, the equal protection analysis is "'precisely the same[.]'"  See Wayte v. United States, 470 U.S. 598, 608 n.9 (1985) (quoting Weinberger v. Wiesenfeld, 420

this Court.  Accordingly, under governing equal protection principles, DOMA is subject to rational basis review.

### 3.    DOMA Satisfies Rational Basis Review

In light of the foregoing analysis, DOMA is necessarily subject only to rational basis review.  See, e.g., Glucksberg, 521 U.S. at 728.  The Supreme Court has described the elements of rational basis review in Heller v. Doe:

> [R]ational-basis review . . . is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.  [A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a *strong presumption of validity*.  Such a classification cannot [be found unconstitutional] if there is a rational relationship between the [challenged government action] and some legitimate governmental purpose. . . . [A] classification must be upheld . . . if there is *any reasonably conceivable state of facts* that could provide a rational basis for the classification.
>
> [The government], moreover, has *no* obligation *to produce evidence* to sustain the rationality of a statutory classification.  A legislative choice is not subject to courtroom factfinding and may be *based on rational speculation* unsupported by evidence or empirical data.  *[T]he burden is on the one attacking* the legislative arrangement to *negative every conceivable basis* which might support it, whether or not the basis has a foundation in the record.  Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an *imperfect fit between means and ends*.

509 U.S. 312, 319-20 (1993) (emphasis added) (citations and internal quotation marks omitted).

As the First Circuit has held, "[t]he question is not what went on in the mind of the state actor but whether anyone, including the judge, can conceive of a rational reason for such a classification."  Jeneski v. City Of Worcester, 476 F.3d 14, 17 (1st Cir. 2007) (citing Nordlinger v. Hahn, 505 U.S. 1, 11-12 (1992).  See also Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield, 907 F.2d 239, 246 (1st Cir. 1990) ("question is only whether a rational

U.S. 636, 638 n.2 (1975)).  See also, e.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 217-18 (1995); Bolling v. Sharpe, 347 U.S. 497 (1954).

relationship exists between the [law] and a *conceivable* legitimate governmental objective") (emphasis in original).  Accord, e.g., Shaw v. Oregon Pub. Employees' Retirement Bd., 887 F.2d 947, 948-49 (9th Cir. 1989) (a court applying rational basis review "may even hypothesize the motivations of the . . . legislature to find a legitimate objective promoted by the provision under attack.") (internal quotation marks omitted).  This test imposes a "very difficult burden" on the plaintiffs, United States v. Phelps, 17 F.3d 1334, 1345 (10th Cir. 1994); rational basis analysis is "a paradigm of judicial restraint."  FCC v. Beach Communications, Inc., 508 U.S. 307, 314 (1993).

Section 3 of DOMA withstands review under this deferential standard.  DOMA was enacted in 1996, as the debate regarding marriage equality was just beginning in the States.  At that time, no State had actually permitted gay and lesbian couples to marry.  In the intervening years, six States have enacted statutes or issued court decisions that permit (or will soon permit) same-sex marriage.[15]  On the other hand, 29 States have promulgated constitutional amendments that limit marriage to opposite-sex couples, and 11 more States have enacted statutes to the same effect.

As the state legislative and constitutional activity in the years since DOMA was enacted demonstrates, same-sex marriage is a contentious social issue.  Given the evolving nature of this issue, Congress was constitutionally entitled to maintain the status quo pending further evolution in the States.  Otherwise, "marriage" and "spouse" for the purposes of federal law would depend on the outcome of this debate in each State, with the meanings of those terms under federal law potentially changing with any change in the status of the debate in a given State.  Federal rights

---

[15]     Those States are New Hampshire, Maine, Vermont, Iowa, Connecticut, and Massachusetts.

would vary dramatically from State to State. Congress could reasonably have concluded that there is a legitimate government interest in maintaining the status quo and preserving relative consistency in the nationwide distribution of marriage-based federal benefits.

Rational basis review recognizes that the legislature is entitled to respond to new social phenomena one step at a time and to adjust national policy incrementally. See Medeiros v. Vincent, 431 F.3d 25, 31-32 (1st Cir. 2005) ("[A] statute or regulation is not lacking in a rational basis simply because it addresses a broader problem in small or incremental stages. It is only necessary that there be some rational relation between the method chosen and the intended result.") (citation omitted); accord Butler v. Apfel, 144 F.3d 622, 625 (9th Cir.1998) ("[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."). As the Supreme Court has observed, legislatures may "refin[e] their preferred approach as circumstances change and as they develop a more-nuanced understanding of how best to proceed." Massachusetts v. EPA, 549 U.S. 497, 524 (2007); see SEC v. Chenery Corp., 332 U.S. 194, 202 (1947) ("Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations."). DOMA reflects just such a response. It maintains the status quo on the national level and permits autonomy and legal evolution on the state level.[16]

---

[16]    In this case, the government does not rely on certain purported interests set forth in the legislative history of DOMA, including the purported interests in "responsible procreation and child-rearing" -- that is, the assertions that (1) the government's interest in "responsible procreation" justifies limiting marriage to a union between one man and one woman, and (2) that the government has an interest in promoting the raising of children by both of their biological parents. See H.R. Rep. No. 104-664, at 12-13, reprinted in 1996 U.S.C.C.A.N. at 2916-17. Since the enactment of DOMA, many leading medical, psychological, and social welfare organizations have issued policies opposing restrictions on lesbian and gay parenting upon concluding, based on numerous studies, that children raised by gay and lesbian parents are as likely to be well-adjusted as children raised by heterosexual parents. See American Academy of Pediatrics, http://aappolicy.aappublications.org/cgi/content/full/pediatrics;109/2/339 (February

Thus, even if it were true that DOMA requires Massachusetts to treat same-sex and opposite-sex married couples differently (and, as explained above, DOMA does not compel such state action), that different treatment is not unconstitutional because it results from what Congress could have viewed as a rational decision to maintain the federal status quo on marriage-based benefits pending further evolution in the States' understanding of marriage.  Similarly, even if DOMA is properly viewed as imposing conditions on Medicaid and veterans cemetery funding (and it is not), those conditions necessarily satisfy the "low-threshold" test, Cutter, 423 F.3d at 587, of "minimum rationality," Kansas, 214 F.3d at 1199, that comprises any "nexus" test as minimum rationality is equivalent to the standard of rational-basis scrutiny applied to economic and social welfare legislation under substantive due process and equal protection analysis.  Whatever federal interests a particular funding program might otherwise serve, the condition imposed by application of DOMA also serves the federal interest in avoiding a use of federal funds beyond those that Congress has authorized, as well as the legitimate interests that Congress could have rationally concluded were furthered by DOMA.  Cf. Sabri, 541 U.S. at 605-6.

---

2002 policy statement); American Psychological Association, http://www.apa.org/pi/lgbc/policy/parents.html (July 2004 policy statement); American Academy of Child and Adolescent Psychiatry, http://www.aacap.org/cs/root/policy_statements/gay_lesbian_transgender_and_bisexual_parents_policy_statement (June 1999 policy statement); American Medical Association, http://www.ama-assn.org/ama/pub/about-ama/our-people/member-groups-sections/glbt-advisory-committee/ama-policy-regarding-sexual-orientation.shtml (AMA Policy Regarding Sexual Orientation); Child Welfare League of America, http://www.cwla.org/programs/culture/glbtqposition.htm (Position Statement on Parenting of Children by Lesbian, Gay, and Bisexual Adults).  Furthermore, in Lawrence v. Texas, 539 U.S. 558, 605 (2003), Justice Scalia acknowledged in his dissent that encouraging procreation would not be a rational basis for limiting marriage to opposite-sex couples under the reasoning of the Lawrence majority opinion -- which, of course, is the prevailing law -- because "the sterile and the elderly are allowed to marry."  Thus, the government does not believe that DOMA can be justified by interests in "responsible procreation" or "child-rearing."

III.    **MASSACHUSETTS' ALLEGATIONS THAT IT "RISKS" SPECULATIVE FUTURE HARM UNDER DOMA DO NOT SUPPORT ARTICLE III STANDING**

As discussed above, the Commonwealth has failed to state a claim upon which relief can be granted against all defendants because its claims fail under prevailing law.  The Commonwealth also lacks Article III standing to raise its claims that are based on the "risk" of speculative future injury, including all of plaintiff's claims against VA and its Secretary.  Article III of the Constitution requires a plaintiff, "at an irreducible minimum," to show: (1) a distinct and palpable injury, actual or threatened; (2) that the injury is fairly traceable to the defendant's conduct; and (3) that a favorable decision is likely to redress the complained-of injury.  E.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); Pagan v. Calderon, 448 F.3d 16, 27 (1st Cir. 2006).  As to its claims based on "risks," the Commonwealth cannot establish the first prong of this test because it cannot establish an injury-in-fact that is more than speculative.

Plaintiff describes the alleged harm it suffers at the hand of VA as "risking enforcement for non-compliance by the VA."  Compl. ¶ 79.  Where, as here, a plaintiff seeks only injunctive and declaratory relief, it "must establish that the feared harm is 'actual or imminent, not conjectural or hypothetical.'"  Berner v. Delahanty, 129 F.3d 20, 24 (1st Cir. 1997) (quoting Lujan, 504 U.S. at 560).  But the Commonwealth can point only to its conjecture about contingent harms -- "risk[s]."  Nowhere does the Commonwealth allege that VA has recaptured

grant funds from Massachusetts or even stated that it will do so.[17]  Essentially, the

Commonwealth alleges that such a harm is possible.  That is not enough.

Plaintiff states that "Massachusetts veterans and their family members regularly apply for

burial in either the Agawam or Winchendon [state-owned veterans'] cemetery far in advance of

their deaths."  Compl. ¶ 75.  In response to such an application, which may be "far in advance" of

any burial, Massachusetts "has pre-approved an application for burial submitted by a

Massachusetts veteran and his same-sex spouse.  This same-sex spouse is not otherwise eligible

for burial in a Massachusetts veterans' cemetery."  Compl. ¶ 77.  But the Commonwealth does

not allege that any such same-sex spouse has been, or is even about to be, buried in a

Massachusetts veterans' cemetery.  Nor does it allege that VA has recaptured or even decided

whether to recapture funds from the Commonwealth.  Yet those factors are critical, as the

Commonwealth recognizes.  See Compl. ¶¶ 72, 78; see also 38 U.S.C. § 2408(b)(3) (providing

---

[17]  The Commonwealth's conclusions that the "*VA has mandated* that [the Massachusetts Department of Veterans Services] must disregard the valid marriages of veterans and their same-sex spouses *in order to continue to receive federal funds*" (Compl. ¶ 97) (emphasis added) and that "*CMS has mandated* that MassHealth must disregard the valid marriages of same-sex couples *in order to continue to receive federal funds*" (Compl. ¶ 95) (emphasis added) are belied by the law and the correspondence attached to and incorporated by the plaintiff's Complaint.  See Fed. R. Civ. P. 10(c).  The Court need not accept a complaint's "'bald assertions' or legal conclusions" when assessing a motion to dismiss.  See Abbott, III v. United States, 144 F.3d 1, 2 (1st Cir. 1998) (citing Shaw v. Digital Equip. Corp., 82 F.3d 1194,1216 (1st Cir. 1996)).  As to the VA, the Commonwealth has not alleged that it has been ordered to return any state cemetery grants funds or that it has been denied funds based on DOMA.  See Compl. ¶ 72, Exhibits 3, 4 (VA has stated it would be authorized to recapture grant funds from Massachusetts if it buries a veterans' same-sex spouse who is not otherwise eligible for burial in a veterans' cemetery, but that a decision on whether to recapture funds would be made by Executive branch officials in office at the time); 38 U.S.C. § 2408(b)(3).  As to Medicaid, and consistent with current federal law, the federal government does not now fund MassHealth payments made based on recognition of a same-sex marriage.  See Compl. ¶ 54, Exh. 1, 2; 42 U.S.C. §§ 1396b(a)(1), 1396d(b).  But federal law also does not penalize the Commonwealth for expanding MassHealth coverage to beneficiaries whose claims are not eligible for FFP.  Id.

that VA is "entitled" to recoup funds from a cemetery that received State Cemetery Grants

Program funds, but not commanding VA to recoup the funds).  Indeed, as VA informed the

Commonwealth in 2004:

> While we believe section 2408 would entitle the United States to recapture
> cemetery grant funds if a grantee permitted the burial of veterans' same-sex
> spouses, whether the Government would assert such claims would depend upon
> the policies of the Executive branch officials in office at the time.

See June 18, 2004, Letter from Tim S. McClain, General Counsel to the Department of Veteran

Affairs, to Joan E. O'Connor, General Counsel, Massachusetts Department of Veterans'

Services, at 2 (filed as Exhibit 3 to plaintiff's Complaint).  Thus, the alleged harm (described

only as "risking enforcement for non-compliance by the VA," Compl. ¶ 79) has not yet occurred,

and, indeed, cognizable harm will only occur *if* the Commonwealth is called upon to bury a

veteran's same-sex spouse in a federally-granted state veterans' cemetery, *if* the law is unchanged

at that time, *and if* the relevant federal officials choose, in their discretion, to seek to recoup

monies previously given to Massachusetts.  Such speculation lacks the "immediacy or

imminence" required to establish cognizable harm for Article III standing.  See McInnis-Misenor

v. Me. Med. Ctr., 319 F.3d 63, 68 (1st Cir. 2003) (citing City of Los Angeles v. Lyons, 461 U.S.

95, 101-02 (1983)).

Similarly, the Commonwealth lacks standing to raise speculative claims against HHS and

its Secretary.  At this time, the United States does not dispute that plaintiff has standing to

challenge restrictions on the provision of federal Medicaid matching funds impacted by DOMA

that have, in fact, been applied to the Commonwealth.  However, to the extent the

Commonwealth bases its claims concerning Medicaid merely on a speculative "risk[]" of future

federal enforcement, see Compl. ¶¶ 45, 62, such claims do not satisfy the case-or-controversy

requirement of Article III.  McInnis-Misenor, 319 F.3d at 68.

Because the Commonwealth lacks standing at this time to raise its claims against VA and its Secretary, or any claims against HHS and its Secretary based only on the "risk" of some future enforcement action, those claims should be dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action with prejudice.

Dated: October 30, 2009

Respectfully submitted,

TONY WEST
Assistant Attorney General

MICHAEL K. LOUCKS
Acting United States Attorney

ARTHUR R. GOLDBERG
Assistant Director, Federal Programs Branch

  /s/ Steven Y. Bressler
STEVEN Y. BRESSLER D.C. Bar #482492
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone:     (202) 305-0167
Facsimile:     (202) 318-7609
Steven.Bressler@usdoj.gov

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I, Steven Y. Bressler, hereby certify that on this 30th day of October, 2009, this document filed through the ECF system shall be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies shall be sent by first-class mail postage prepaid to:

Mark A. Thomas, movant
482 Beacon Street
Boston, MA 02115
Proposed Intervenor

_____ */s/ Steven Y. Bressler* _____
STEVEN Y. BRESSLER