UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS,      *
                                    *
            Plaintiff,              *
                                    *
v.                                  *       Civil Action No. 1:09-11156-JLT
                                    *
UNITED STATES DEPARTMENT OF HEALTH  *
AND HUMAN SERVICES; KATHLEEN        *
SEBELIUS, in her official capacity as the Secretary *
of the United States Department of Health and *
Human Services; UNITED STATES      *
DEPARTMENT OF VETERANS AFFAIRS;     *
ERIC K. SHINSEKI, in his official capacity as the *
Secretary of the United States Department of *
Veterans Affairs; and the UNITED STATES OF *
AMERICA,                            *
                                    *
            Defendants.              *


MEMORANDUM

July 8, 2010

TAURO, J.

I.      Introduction

        This action presents a challenge to the constitutionality of Section 3 of the Defense of

Marriage Act[1] as applied to Plaintiff, the Commonwealth of Massachusetts (the

"Commonwealth").[2]  Specifically, the Commonwealth contends that DOMA violates the Tenth

---

[1] 1 U.S.C. § 7.

[2] Defendants in this action are the United States Department of Health and Human
Services, Kathleen Sebelius, in her official capacity as the Secretary of the Department of Health
and Human Services, the United States Department of Veterans Affairs, Eric K. Shinseki, in his
official capacity as the Secretary of the Department of Veterans Affairs, and the United States of
America.  Hereinafter, this court collectively refers to the Defendants as "the government."

Amendment of the Constitution, by intruding on areas of exclusive state authority, as well as the

Spending Clause, by forcing the Commonwealth to engage in invidious discrimination against its

own citizens in order to receive and retain federal funds in connection with two joint federal-state

programs.  Because this court agrees, <u>Defendants' Motion to Dismiss</u> [#16] is DENIED and

<u>Plaintiff's Motion for Summary Judgment</u> [#26] is ALLOWED.[3]

II.    <u>Background</u>[4]

    A.    <u>The Defense of Marriage Act</u>

Congress enacted the Defense of Marriage Act ("DOMA") in 1996, and President Clinton

signed it into law.[5]   The Commonwealth, by this lawsuit, challenges Section 3 of DOMA, which

defines the terms "marriage" and "spouse," for purposes of federal law, to include only the union

of one man and one woman.  In pertinent part, Section 3 provides:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or
> interpretation of the various administrative bureaus and agencies of the United
> States, the word 'marriage' means only a legal union between one man and one
> woman as husband and wife, and the word 'spouse' refers only to a person of the
> opposite sex who is a husband or a wife."[6]

---

[3]In the companion case of <u>Gill et al. v. Office of Pers. Mgmt. et al.</u>, No. 09-cv-10309-JLT (D. Mass. July 8, 2010) (Tauro, J.), this court held that DOMA violates the equal protection principles embodied in the Due Process Clause of the Fifth Amendment.

[4]Defendants, with limited exception, concede the accuracy of Plaintiff's Statement of Material Facts [#27].  Resp. to Pl.'s Stmt. Mat'l Facts, ¶¶ 1, 2.  For that reason, for the purposes of this motion, this court accepts the factual representations propounded by Plaintiff, unless otherwise noted.

[5]Pub. L. No. 104-199, 110 Stat. 2419 (1996).  Please refer to the background section of the companion case, <u>Gill et al. v. Office of Pers. Mgmt. et al.</u>, No. 09-cv-10309-JLT (D. Mass. July 8, 2010) (Tauro, J.), for a more thorough review of the legislative history of this statute.

[6]1 U.S.C. § 7.

As of December 31, 2003, there were at least "a total of 1,138 federal statutory provisions classified to the United States Code in which marital status is a factor in determining or receiving benefits, rights, and privileges," according to estimates from the General Accounting Office.[7] These statutory provisions pertain to a variety of subjects, including, but not limited to Social Security, taxes, immigration, and healthcare.[8]

B.      The History of Marital Status Determinations in the United States

State control over marital status determinations predates the Constitution.  Prior to the American Revolution, colonial legislatures, rather than Parliament, established the rules and regulations regarding marriage in the colonies.[9]  And, when the United States first declared its independence from England, the founding legislation of each state included regulations regarding marital status determinations.[10]

In 1787, during the framing of the Constitution, the issue of marriage was not raised when defining the powers of the federal government.[11]  At that time, "[s]tates had exclusive power over marriage rules as a central part of the individual states' 'police power'—meaning their responsibility (subject to the requirements and protections of the federal Constitution) for the

---

[7]Aff. of Jonathan Miller, Ex. 3, p. 1, Report of the U.S. General Accounting Office, Office of General Counsel, January 23, 2004 (GAO-04-353R).

[8]Id. at 1.

[9]Aff. of Nancy Cott (hereinafter, "Cott Aff."), ¶ 9.  Nancy F. Cott, Ph.D., the Jonathan Trumbull Professor of American History at Harvard University, submitted an affidavit on the history of the regulation of marriage in the United States, on which this court heavily relies.

[10]Id.

[11]Id., ¶ 10.

3

health, safety and welfare of their populations."[12]

In large part, rules and regulations regarding marriage corresponded with local circumstances and preferences.[13]  Changes in regulations regarding marriage also responded to changes in political, economic, religious, and ethnic compositions in the states.[14]  Because, to a great extent, rules and regulations regarding marriage respond to local preferences, such regulations have varied significantly from state to state throughout American history.[15]  Indeed, since the founding of the United States "there have been many nontrivial differences in states' laws on who was permitted to marry, what steps composed a valid marriage, what spousal roles should be, and what conditions permitted divorce."[16]

In response to controversies stemming from this "patchwork quilt of marriage rules in the United States," there have been many attempts to adopt a national definition of marriage.[17]  In the mid-1880s, for instance, a constitutional amendment to establish uniform regulations on marriage and divorce was proposed for the first time.[18]  Following the failure of that proposal, there were several other unsuccessful efforts to create a uniform definition of marriage by way of

---

[12] Id.

[13] Id.

[14] Id.

[15] Id., ¶ 14.

[16] Id.

[17] Id., ¶¶ 15, 18-19.

[18] Id., ¶ 19.

constitutional amendment.[19]  Similarly, "[l]egislative and constitutional proposals to nationalize the definition of marriage were put before Congress again and again, from the 1880s to 1950s, with a particular burst of activity during and after World War II, because of the war's perceived damage to the stability of marriage and because of a steep upswing in divorce."[20]  None of these proposals succeeded, however, because "few members of Congress were willing to supersede their own states' power over marriage and divorce."[21]  And, despite a substantial increase in federal power during the twentieth century, members of Congress jealously guarded their states' sovereign control over marriage.[22]

Several issues relevant to the formation and dissolution of marriages have served historically as the subject of controversy, including common law marriage, divorce, and restrictions regarding race, "hygiene," and age at marriage.[23]  Despite contentious debate on all of these subjects, however, the federal government consistently deferred to state marital status determinations.[24]

For example, throughout much of American history a great deal of tension surrounded the issue of interracial marriage.  But, despite differences in restrictions on interracial marriage from state to state, the federal government consistently accepted all state marital status determinations

---

[19]Id.

[20]Id.

[21]Id.

[22]Id.

[23]See id., ¶¶ 20-52.

[24]Id.

for the purposes of federal law.[25]  For that reason, a review of the history of the regulation of interracial marriage is helpful in assessing the federal government's response to the "contentious social issue"[26] now before this court, same-sex marriage.

Rules and regulations regarding interracial marriage varied widely from state to state throughout American history, until 1967, when the Supreme Court declared such restrictions unconstitutional.[27]  And, indeed, a review of the history of the subject suggests that the strength of state restrictions on interracial marriage largely tracked changes in the social and political climate.

Following the abolition of slavery, many state legislatures imposed additional restrictions on interracial marriage.[28]  "As many as 41 states and territories of the U.S banned, nullified, or criminalized marriages across the color line for some period of their history, often using 'racial' classifications that are no longer recognized."[29]  Of those states, many imposed severe punishment on relationships that ran afoul of their restrictions.[30]  Alabama, for instance, "penalized marriage, adultery, or fornication between a white and 'any negro, or the descendant of any negro to the third generation,' with hard labor of up to seven years."[31]

---

[25]Id., ¶ 45.

[26]Defs.' Mem. Mot. Dismiss, 27.

[27]See Cott Aff., ¶¶  36, 44.

[28]Id., ¶ 35.

[29]Id.

[30]Id., ¶ 37.

[31]Id.

In contrast, some states, like Vermont, did not bar interracial marriage.[32]  Similarly, Massachusetts, a hub of antislavery activism, repealed its prohibition on interracial marriage in the 1840s.[33]

The issue of interracial marriage again came to the legislative fore in the early twentieth century.[34]  The controversy was rekindled at that time by the decline of stringent Victorian era sexual standards and the migration of many African-Americans to the northern states.[35] Legislators in fourteen states introduced bills to institute or strengthen prohibitions on interracial marriage in response to the marriage of the African-American boxer Jack Johnson to a young white woman.[36]  These bills were universally defeated in northern states, however, as a result of organized pressure from African-American voters.[37]

In the decades after World War II, in response to the civil rights movement, many states began to eliminate laws restricting interracial marriage.[38]  And, ultimately, such restrictions were completely voided by the courts.[39]  Throughout this entire period, however, the federal

---

[32]Id., ¶ 36.

[33]Id.

[34]Id., ¶ 38.

[35]Id.

[36]Id.

[37]Id., ¶ 38.

[38]Id., ¶ 43.

[39]In 1948, the Supreme Court of California became the first state high court to hold that marital restrictions based on race were unconstitutional.  Id., ¶ 43.  In 1948, the Supreme Court finally eviscerated existing state prohibitions on interracial marriage, finding that "deny[ing] this fundamental freedom on so unsupportable a basis as the racial classifications embodied in these

government consistently relied on state determinations with regard to marriage, when they were relevant to federal law.[40]

C.      Same-Sex Marriage in Massachusetts

In 2003, the Supreme Judicial Court of Massachusetts held that excluding same-sex couples from marriage violated the equality and liberty provisions of the Massachusetts Constitution.[41]  In accordance with this decision, on May 17, 2004, Massachusetts became the first state to issue marriage licenses to same-sex couples.[42]  And, since then, the Commonwealth has recognized "a single marital status that is open and available to every qualifying couple, whether same-sex or different-sex."[43]  The Massachusetts legislature rejected both citizen-initiated and legislatively-proposed constitutional amendments to bar the recognition of same-sex marriages.[44]

As of February 12, 2010, the Commonwealth had issued marriage licenses to at least 15,214 same-sex couples.[45]  But, as Section 3 of DOMA bars federal recognition of these marriages, the Commonwealth contends that the statute has a significant negative impact on the

---

statutes, classifications so directly subversive of the principle of equality at the heart of the Fourteenth Amendment, is surely to deprive all the State's citizens of liberty without due process of law." Loving v. Virginia, 388 U.S. 1, 12 (1967).

[40]Cott Aff., ¶ 45.

[41]Goodridge v. Dep't of Pub. Health, 798 N.E.2d 941, 959-61, 968 (Mass. 2003).

[42]Aff. of Stanley E. Nyberg (hereinafter, "Nyberg Aff."), ¶ 5.

[43]Compl. ¶ 17.

[44]Id., ¶¶ 18-19.

[45]Nyberg Aff., ¶¶ 6-7.

operation of certain state programs, discussed in further detail below.

D.      Relevant Programs

        1.      The State Cemetery Grants Program

There are two cemeteries in the Commonwealth that are used for the burial of eligible military veterans, their spouses, and their children.[46]  These cemeteries, which are located in Agawam and Winchendon, Massachusetts, are owned and operated solely by the Commonwealth.[47]  As of February 17, 2010, there were 5,379 veterans and their family members buried at Agawam and 1,075 veterans and their family members buried at Winchendon.[48]

The Massachusetts Department of Veterans' Services ("DVS") received federal funding from the United States Department of Veterans Affairs ("VA") for the construction of the cemeteries at Agawam and Winchendon, pursuant to the State Cemetery Grants Program.[49]  The federal government created the State Cemetery Grants Program in 1978 to complement the VA's network of national veterans' cemeteries.[50]  This program aims to make veterans' cemeteries available within seventy-five miles of 90% of the veterans across the country.[51]

---

[46]Aff. of William Walls (hereinafter, "Walls Aff."), ¶¶ 5, 7.

[47]Id.

[48]Id., ¶ 4.

[49]Id., ¶ 4.

[50]Walls Aff., ¶ 8 (citations omitted).

[51]Id.

DVS received $6,818,011 from the VA for the initial construction of the Agawam cemetery, as well as $4,780,375 for its later expansion, pursuant to the State Cemetery Grants Program.[52]  DVS also received $7,422,013 from the VA for the construction of the Winchendon cemetery.[53]

In addition to providing funding for the construction and expansion of state veterans' cemeteries, the VA also reimburses DVS $300 for the costs associated with the burial of each veteran at Agawam and Winchendon.[54]  In total, the VA has provided $1,497,300 to DVS for such "plot allowances."[55]

By statute, federal funding for the state veterans' cemeteries in Agawam and Winchendon is conditioned on the Commonwealth's compliance with regulations promulgated by the Secretary of the VA.[56]  If either cemetery ceases to be operated as a veterans' cemetery, the VA can recapture from the Commonwealth any funds provided for the construction, expansion, or improvement of the cemeteries.[57]

The VA regulations require that veterans' cemeteries "be operated solely for the interment

---

[52]Id., ¶ 5.

[53]Id., ¶ 5.

[54]Id., ¶ 6 (citing 38 U.S.C. § 2303(b) ("When a veteran dies in a facility described in paragraph (2), the Secretary shall...pay the actual cost (not to exceed $ 300) of the burial and funeral or, within such limits, may make contracts for such services without regard to the laws requiring advertisement for proposals for supplies and services for the Department...")).

[55]Id., ¶ 6.

[56]38 U.S.C. § 2408(c).

[57]Walls Aff., ¶ 10.

of veterans, their spouses, surviving spouses, [and certain of their] children...."[58]  Since DOMA

provides that a same-sex spouse is not a "spouse" under federal law, DVS sought clarification

from the VA regarding whether DVS could "bury the same-sex spouse of a veteran in its

Agawam or Winchendon state veterans cemetery without losing federal funding provided under

[the] VA's state cemeteries program," after the Commonwealth began recognizing same-sex

marriage in 2004.[59]  In response, the VA informed DVS by letter that "we believe [the] VA would

be entitled to recapture Federal grant funds provided to DVS for either [the Agawam or

Winchendon] cemeteries should [Massachusetts] decide to bury the same-sex spouse of a veteran

in the cemetery, unless that individual is independently eligible for burial."[60]

     More recently, the National Cemetery Administration ("NCA"), an arm of the VA,

published a directive in June 2008 stating that "individuals in a same-sex civil union or marriage

are not eligible for burial in a national cemetery or State veterans cemetery that receives federal

grant funding based on being the spouse or surviving spouse of a same-sex veteran."[61]  In

addition, at a 2008 NCA conference, "a representative from the VA gave a presentation making it

clear that the VA would not permit the burial of any same-sex spouses in VA supported veterans'

cemeteries."[62]

---

[58]38 C.F.R. § 39.5(a).

[59]Walls Aff., ¶ 17, Ex. 1., Letter from Tim S. McClain, General Counsel to the
Department of Veteran Affairs, to Joan E. O'Connor, General Counsel, Massachusetts
Department of Veterans' Services (June 18, 2004).

[60]Id.

[61]Walls Aff., Ex. 2, NCA Directive 3210/1 (June 4, 2008).

[62]Walls Aff., ¶ 20.

On July 17, 2007, Darrel Hopkins and Thomas Hopkins submitted an application for burial in the Winchendon cemetery.[63]  The couple were married in Massachusetts on September 18, 2004.[64]  Darrel Hopkins retired from the United States Army in 1982, after more than 20 years of active military service.[65]  During his time in the Army, Darrel Hopkins served thirteen months in the Vietnam conflict, three years in South Korea, seven years in Germany (including three years in occupied Berlin), and three years at the School of U.S. Army Intelligence at Fort Devens, Massachusetts.[66]  He is a decorated soldier, having earned two Bronze Stars, two Meritorious Service Medals, a Meritorious Unit Commendation, an Army Commendation Medal, four Good Conduct Medals, and Vietnam Service Medals (1-3), and having achieved the rank of Chief Warrant Officer, Second Class.[67]

Because of his long service to the United States Army, as well as his Massachusetts residency, Darrel Hopkins is eligible for burial in Winchendon cemetery.[68]  By virtue of his marriage to Darrel Hopkins, Thomas Hopkins is also eligible for burial in the Winchendon cemetery in the eyes of the Commonwealth, which recognizes their marriage.[69]  But because the Hopkins' marriage is not valid for federal purposes, in the eyes of the federal government,

---

[63]Walls Aff., Ex. 3, Copy of Approved Application.

[64]Walls Aff., ¶ 22, Ex. 4, Marriage License.

[65]Walls Aff., ¶ 23.

[66]Id.

[67]Id., ¶ 24.

[68]Id., ¶ 25.

[69]Id., ¶ 26.

Thomas Hopkins is ineligible for burial in Winchendon.[70]

Seeking to honor the Hopkins' wishes, DVS approved their application for burial in the Winchendon cemetery and intends to bury the couple together.[71]

        2.   <u>MassHealth</u>

Medicaid is a public assistance program dedicated to providing medical services to needy individuals,[72] by providing federal funding (also known as "federal financial participation" or "FFP") to states that pay for medical services on behalf of those individuals.[73] Massachusetts' Executive Office of Health and Human Services administers the Commonwealth's Medicaid program, known as MassHealth.[74]

MassHealth provides comprehensive health insurance or assistance in paying for private health insurance to approximately one million residents of Massachusetts.[75] The Department of Health and Human Services ("HHS") reimburses MassHealth for approximately one-half of its Medicaid expenditures[76] and administration costs.[77] HHS provides MassHealth with billions of

---

[70]<u>Id.</u>, ¶ 26.

[71]<u>Id.</u>, ¶¶ 21, 27.

[72]Aff. of Robin Callahan (hereinafter, "Callahan Aff."), ¶ 4.

[73]<u>Id.</u>

[74]<u>Id.</u>, ¶¶ 2, 5.

[75]<u>Id.</u>, ¶ 5.

[76]<u>Id.</u>, ¶ 7.

[77]<u>Id.</u>, ¶ 7.

dollars in federal funding every year.[78]  For the fiscal year ending on June 30, 2008, for example,

HHS provided MassHealth with approximately $5.3 billion in federal funding.[79]

To qualify for federal funding, the Secretary of HHS must approve a "State plan"

describing the nature and scope of the MassHealth program.[80]  Qualifying plans must meet several

statutory requirements.[81]  For example, qualifying plans must ensure that state-assisted healthcare

is not provided to individuals whose income or resources exceed certain limits.[82]

Marital status is a relevant factor in determining whether an individual is eligible for

coverage by MassHealth.[83]  The Commonwealth asserts that, because of DOMA, federal law

requires MassHealth to assess eligibility for same-sex spouses as though each were single, a

mandate which has significant financial consequences for the state.[84]  In addition, the

Commonwealth cannot obtain federal funding for expenditures made for coverage provided to

same-sex spouses who do not qualify for Medicaid when assessed as single, even though they

would qualify if assessed as married.[85]

---

[78]Id., ¶ 6.

[79]Id., ¶ 6 (Commonwealth of Massachusetts, OMB Circular A-133 Report (June 30, 2008) at 9, http://www.mass.gov/Aosc/docs/reports_audits/SA/2008/2008_single_audit.pdf (last visited Feb. 17, 2010)).

[80]Id., ¶ 8.

[81]Id., ¶ 9 (citing 42 U.S.C. §§ 1396a(a)(1)-(65)).

[82]Id., ¶ 9.

[83]Id., ¶ 11.

[84]Id., ¶ 14.

[85]Id.

The Commonwealth contends that, under certain circumstances, the recognition of same-sex marriage leads to the denial of health benefits, resulting in cost savings for the state. By way of example, in a household of same-sex spouses under the age of 65, where one spouse earns $65,000 and the other is disabled and receives $13,000 per year in Social Security benefits,[86] neither spouse would be eligible for benefits under MassHealth's current practice, since the total household income, $78,000, substantially exceeds the federal poverty level, $14,412.[87] Since federal law does not recognize same-sex marriage, however, the disabled spouse, who would be assessed as single according to federal practice, would be eligible for coverage since his income alone, $13,000, falls below the federal poverty level.[88]

The recognition of same-sex marriages also renders certain individuals eligible for benefits for which they would otherwise be ineligible.[89] For instance, in a household consisting of two same-sex spouses under the age of 65, one earning $33,000 per year and the other earning only $7,000 per year,[90] both spouses are eligible for healthcare under MassHealth because, as a married couple, their combined income—$40,000—falls below the $43,716 minimum threshold established for spouses.[91] In the eyes of the federal government, however, only the spouse

---

[86] Id., ¶ 11.

[87] Id., ¶ 11.

[88] Id., ¶ 11.

[89] Id., ¶ 12.

[90] Id., ¶ 12.

[91] Id., ¶ 12.

earning $7,000 per year is eligible for Medicaid coverage.[92]

After the Commonwealth began recognizing same-sex marriages in 2004, MassHealth

sought clarification, by letter, from HHS's Centers for Medicare & Medicaid Services ("CMS") as

to how to implement its recognition of same-sex marriages with respect to Medicaid benefits.[93]  In

response, CMS informed MassHealth that "[i]n large part, DOMA dictates the response" to the

Commonwealth's questions, because "DOMA does not give the [CMS] the discretion to

recognize same-sex marriage for purposes of the Federal portion of Medicaid."[94]

The Commonwealth enacted the MassHealth Equality Act in July 2008, which provides

that "[n]otwithstanding the unavailability of federal financial participation, no person who is

recognized as a spouse under the laws of the commonwealth shall be denied benefits that are

otherwise available under this chapter due to the provisions of [DOMA] or any other federal non-

recognition of spouses of the same sex."[95]

Following the passage of the MassHealth Equality Act, CMS reaffirmed that DOMA

"limits the availability of FFP by precluding recognition of same- sex couples as 'spouses' in the

Federal program."[96]  In addition, CMS stated that "because same sex couples are not spouses

---

[92]Id., ¶ 12.

[93]Id., ¶ 15.

[94]Id., ¶¶ 15-17, Ex. 1, Letter from Charlotte S. Yeh, Regional Administrator, Centers for Medicare & Medicaid Services, to Kristen Reasoner Apgar, General Counsel, Commonwealth of Massachusetts, Executive Office of Health and Human Services (May 28, 2004).

[95]Callahan Aff., ¶ 18, Mass. Gen. Laws ch. 118E, § 61.

[96]Callahan Aff., Ex. 2, Letter from Richard R. McGreal, Associate Regional Administrator, Centers for Medicare & Medicaid Services, to JudyAnn Bigby, M.D., Secretary, Commonwealth of Massachusetts, Executive Office of Health and Human Services (August 21,

under Federal law, the income and resources of one may not be attributed to the other without actual contribution, i.e. you must not deem income or resources from one to the other."[97]  Finally, CMS informed the Commonwealth that it "must pay the full cost of administration of a program that does not comply with Federal law."[98]

Currently, MassHealth denies coverage to married individuals who would be eligible for medical assistance if assessed as single pursuant to DOMA, a course of action which saves MassHealth tens of thousands of dollars annually in additional healthcare costs.[99]  Correspondingly, MassHealth provides coverage to married individuals in same-sex relationships who would not be eligible if assessed as single, as required by DOMA.  To date, the Commonwealth estimates that CMS' refusal to provide federal funding to individuals in same-sex couples has resulted in $640,661 in additional costs and as much as much as $2,224,018 in lost federal funding.[100]

     3.    Medicare Tax

Under federal law, health care benefits for a different-sex spouse are excluded from an employee's taxable income.[101]  The value of health care benefits provided to an employee's

---

2008).

    [97]Id.

    [98]Id.

    [99]Callahan Aff., ¶ 22.

    [100]Id., ¶ 23.

    [101]Aff. of Kevin McHugh (hereinafter, "McHugh Aff."), ¶ 4 (citing 26 U.S.C. § 106; 26 C.F.R. § 1.106-1).

same-sex spouse, however, is considered taxable and must be imputed as extra income to the employee for federal tax withholding purposes.[102]

The Commonwealth is required to pay Medicare tax for each employee hired after April 1, 1986, in the amount of 1.45% of each employee's taxable income.[103]  Because health benefits for same-sex spouses of Commonwealth employees are considered to be taxable income for federal purposes, the Commonwealth must pay an additional Medicare tax for the value of the health benefits provided to the same-sex spouses.[104]

As of December 2009, 398 employees of the Commonwealth provided health benefits to their same-sex spouses.[105]  For those employees, the amount of monthly imputed income for healthcare benefits extended to their spouses ranges between $400 and $1000 per month.[106]  For that reason, the Commonwealth has paid approximately $122,607.69 in additional Medicare tax between 2004, when the state began recognizing same-sex marriages, and December 2009.[107]

Furthermore, in order to comply with DOMA, the Commonwealth's Group Insurance Commission has been forced to create and implement systems to identify insurance enrollees who provide healthcare coverage to their same-sex spouses, as well as to calculate the amount of

---

[102]McHugh Aff., ¶ 4.

[103]Id., ¶ 5 (citing 26 U.S.C. §§ 3121(u), 3111(b)).

[104]Id.

[105]Id.

[106]Id., ¶ 7.

[107]Id., ¶ 8.

18

imputed income for each such enrollee.[108]  Developing such a system cost approximately $47,000,

and the Group Insurance Commission continues to incur costs on a monthly basis to comply with

DOMA.[109]

III.     Discussion

A.     Summary Judgment

Summary judgment is appropriate where there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law.[110]  In reviewing a motion for

summary judgment, the court "must scrutinize the record in the light most favorable to the

summary judgment loser and draw all reasonable inferences therefrom to that party's behoof."[111]

As the Parties do not dispute the material facts relevant to the constitutional questions raised by

this action, it is appropriate to dispose of the issues as a matter of law.[112]

B.     Standing

This court first addresses the government's contention that the Commonwealth lacks

---

[108]Aff. of Dolores Mitchell (hereinafter, "Mitchell Aff."), ¶¶ 2, 4-9.

[109]Id., ¶ 10.

[110]Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008).

[111]Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005).

[112]This court notes that Defendants' Motion to Dismiss [#16] is also currently pending.
Because there are no material facts in dispute and Defendants' Motion to Dismiss turns on the
same purely legal question as the pending Motion for Summary Judgment, this court finds it
appropriate, as a matter of judicial economy, to address the two motions simultaneously.

standing to bring certain claims against the VA and HHS.[113]

"The irreducible constitutional minimum of standing" hinges on a claimant's ability to establish the following requirements: "[f]irst and foremost, there must be alleged (and ultimately proven) an injury in fact....  Second, there must be causation–a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant.  And third, there must be redressability–a likelihood that the requested relief will redress the alleged injury."[114]

The government claims that the Commonwealth has failed to sufficiently establish an injury in fact because "its claims are based on the 'risk' of speculative future injury."[115] Specifically, the government contends that (1) allegations that the VA intends to recoup federal grants for state veterans' cemeteries grants lacks the "imminency" required to establish Article III standing, and (2) allegations regarding the HHS' provision of federal Medicaid matching funds constitute nothing more than a hypothetical risk of future enforcement. The government's arguments are without merit.

The evidentiary record is replete with allegations of past and ongoing injuries to the Commonwealth as a result of the government's adherence to the strictures of DOMA.  Standing is not contingent, as the government suggests, on Thomas Hopkins—or another similarly-situated individual—being lowered into his grave at Winchendon, or on the Commonwealth's receipt of an invoice for millions in federal state veterans cemetery grant funds.  Indeed, a plaintiff is not

---

[113]The government does not dispute that the Commonwealth has standing to challenge restrictions on the provision of federal Medicaid matching funds that have already been applied. Defs.' Mem. Mot. Dismiss, 34.

[114]Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-04 (1998).

[115]Defs.' Mem. Mot. Dismiss, 32.

required "to expose himself to liability before bringing suit to challenge the basis for the threat," particularly where, as here, it is the government that threatens to impose certain obligations.[116]

By letter, the VA already informed the Massachusetts Department of Veterans' Services that the federal government is entitled to recapture millions of dollars in federal grants if the Commonwealth decides to entomb an otherwise ineligible same-sex spouse of a veteran at Agawam or Winchendon. And, given that the Hopkins' application to be buried together has already received the Commonwealth's stamp of approval, the matter is ripe for adjudication.

Moreover, in light of the undisputed record evidence, the argument that the Commonwealth lacks standing to challenge restrictions on the provision of federal Medicaid matching funds to MassHealth cannot withstand scrutiny. The Commonwealth has amassed approximately $640,661 in additional tax liability and forsaken at least $2,224,018 in federal funding because DOMA bars HHS's Centers for Medicare & Medicaid Services from using federal funds to insure same-sex married couples. Given that the HHS has given no indication that it plans to change course, it is disingenuous to now argue that the risk of future funding denials is "merely...speculative."[117] The evidence before this court clearly demonstrates that the Commonwealth has suffered, and will continue to suffer, economic harm sufficient to satisfy the injury in fact requirement for Article III standing.

C.   Challenges to DOMA Under the Tenth Amendment and the Spending Clause of the Constitution

This case requires a complex constitutional inquiry into whether the power to establish

---

[116]See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-129 (2007).

[117]Def.'s Mem. Mot. Dismiss, 34.

marital status determinations lies exclusively with the state, or whether Congress may siphon off a portion of that traditionally state-held authority for itself.  This Court has merged the analyses of the Commonwealth challenges to DOMA under the Spending Clause and Tenth Amendment because, in a case such as this, "involving the division of authority between federal and state governments," these inquiries are two sides of the same coin.[118]

It is a fundamental principle underlying our federalist system of government that "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution."[119]  And, correspondingly, the Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[120]  The division between state and federal powers delineated by the Constitution is not merely "formalistic."[121]   Rather, the Tenth Amendment "leaves to the several States a residuary and inviolable sovereignty."[122]  This reflects a founding principle of governance in this country, that "[s]tates are not mere political subdivision of the United States," but rather sovereigns unto themselves.[123]

The Supreme Court has handled questions concerning the boundaries of state and federal power in either of two ways: "In some cases the Court has inquired whether an Act of Congress is

---

[118]New York v. United States, 505 U.S. 144, 156 (1992).

[119]United States v. Morrison, 529 U.S. 598, 607 (2000).

[120]U.S. CONST. Amend.  X.

[121]New York v. United States, 505 U.S. 144, 187 (1992).

[122]Id. at 188 (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961)).

[123]Id.

authorized by one of the powers delegated to Congress in Article I of the Constitution.... In other cases the Court has sought to determine whether an Act of Congress invades the province of state sovereignty reserved by the Tenth Amendment."[124]

Since, in essence, "the two inquiries are mirror images of each other,"[125] the Commonwealth challenges Congress' authority under Article I to promulgate a national definition of marriage, and, correspondingly, complains that, in doing so, Congress has intruded on the exclusive province of the state to regulate marriage.

      1.    <u>DOMA Exceeds the Scope of Federal Power</u>

Congress' powers are "defined and limited," and, for that reason, every federal law "must be based on one or more of its powers enumerated in the Constitution."[126]   As long as Congress acts pursuant to one of its enumerated powers, "its work product does not offend the Tenth Amendment."[127]   Moreover, "[d]ue respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds."[128]   Accordingly, it is for this court to determine whether DOMA represents a valid exercise of congressional authority under the Constitution, and therefore must stand, or indeed has no such footing.

---

[124]<u>New York</u>, 505 U.S. at 155.

[125]<u>Id.</u> at 156.

[126]<u>United States v. Morrison</u>, 529 U.S. 598, 607 (2000) (quoting <u>Marbury v. Madison</u>, 5 U.S. 137 (1803)).

[127]<u>United States v. Meade</u>, 175 F.3d 215, 224 (1st Cir. 1999) (citing <u>Gregory v. Ashcroft</u>, 501 U.S. 452, 460 (1991)).

[128]<u>Morrison</u>, 529 U.S. at 607.

The First Circuit has upheld federal regulation of family law only where firmly rooted in an enumerated federal power.[129]  In many cases involving charges that Congress exceeded the scope of its authority, e.g. Morrison[130] and Lopez,[131] courts considered whether the challenged federal statutes contain "express jurisdictional elements" tying the enactment to one of the federal government's enumerated powers.  DOMA, however, does not contain an explicit jurisdictional element.  For that reason, this court must weigh the government's contention that DOMA is grounded in the Spending Clause of the Constitution.  The Spending Clause provides, in pertinent part:

> The Congress shall have Power to Lay and collect Taxes, Duties,
> Imposts and Excises, to pay Debts and provide for the common
> Defence and general Welfare of the United States; but all Duties,
> Imposts and Excises shall be uniform throughout the United States.[132]

The government claims that Section 3 of DOMA is plainly within Congress' authority under the Spending Clause to determine how money is best spent to promote the "general welfare" of the public.

It is first worth noting that DOMA's reach is not limited to provisions relating to federal spending.  The broad sweep of DOMA, potentially affecting the application of 1,138 federal

---

[129]See United States v. Bongiorno, 106 F.3d 1027 (1st Cir. 1997) (the Child Support Recovery Act is a valid exercise of congressional authority pursuant to the Commerce Clause).

[130]529 U.S. at 612 (noting that Section 13981 of the Violence Against Women Act of 1994 "contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce").

[131]United States v. Lopez, 514 U.S. 549, 561-62 (1995) ("§ 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce").

[132]U.S. Const. art. I, § 8.

24

statutory provisions in the United States Code in which marital status is a factor, impacts, among other things, copyright protections, provisions relating to leave to care for a spouse under the Family and Medical Leave Act, and testimonial privileges.[133]

It is true, as the government contends, that "Congress has broad power to set the terms on which it disburses federal money to the States" pursuant to its spending power.[134]  But that power is not unlimited.  Rather, Congress' license to act pursuant to the spending power is subject to certain general restrictions.[135]

In South Dakota v. Dole,[136] the Supreme Court held that "Spending Clause legislation must satisfy five requirements: (1) it must be in pursuit of the 'general welfare,' (2) conditions of funding must be imposed unambiguously, so states are cognizant of the consequences of their participation, (3) conditions must not be 'unrelated to the federal interest in particular national projects or programs' funded under the challenged legislation, (4) the legislation must not be barred by other constitutional provisions, and (5) the financial pressure created by the conditional grant of federal funds must not rise to the level of compulsion."[137]

The Commonwealth charges that DOMA runs afoul of several of the above-listed restrictions.  First, the Commonwealth argues that DOMA departs from the fourth Dole

---

[133]Pl.'s Reply Mem., 3.

[134]Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296 (2006).

[135]South Dakota v. Dole, 483 U.S. 203, 207 (1987).

[136]483 U.S. 203 (1987).

[137]Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 128 (1st Cir. 2003) (citing Dole, 483 U.S. at 207-08, 211).

requirement, regarding the constitutionality of Congress' exercise of its spending power, because the statute is independently barred by the Equal Protection Clause.  Second, the Commonwealth claims that DOMA does not satisfy the third <u>Dole</u> requirement, the "germaneness" requirement, because the statute's treatment of same-sex couples is unrelated to the purposes of Medicaid or the State Veterans Cemetery Grants Program.

This court will first address the Commonwealth's argument that DOMA imposes an unconstitutional condition on the receipt of federal funds.  This fourth <u>Dole</u> requirement "stands for the unexceptionable proposition that the power may not be used to induce the States to engage in activities that would themselves be unconstitutional."[138]

The Commonwealth argues that DOMA impermissibly conditions the receipt of federal funding on the state's violation of the Equal Protection Clause of the Fourteenth Amendment by requiring that the state deny certain marriage-based benefits to same-sex married couples.  "The Fourteenth Amendment 'requires that all persons subjected to...legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed.'"[139]  And where, as here, "those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to assure that all persons subject to legislation or regulation are indeed being treated alike, under like circumstances and conditions."[140]

---

[138]<u>Dole</u>, 483 U.S. at 210.

[139]<u>Engquist v. Or. Dep't of Agric.</u>, 553 U.S. 591 (2008) (quoting <u>Hayes v. Missouri</u>, 120 U.S. 68, 71-72 (1887)).

[140]<u>Id.</u> (internal citation omitted).

In the companion case, <u>Gill et al. v. Office of Pers. Mgmt. et al.</u>, No. 09-cv-10309-JLT

(D. Mass. July 8, 2010) (Tauro, J.), this court held that DOMA violates the equal protection

principles embodied in the Due Process Clause of the Fifth Amendment.  There, this court found

that DOMA failed to pass constitutional muster under rational basis scrutiny, the most highly

deferential standard of review.[141]  That analysis, which this court will not reiterate here, is equally

applicable in this case.  DOMA plainly conditions the receipt of federal funding on the denial of

marriage-based benefits to same-sex married couples, though the same benefits are provided to

similarly-situated heterosexual couples.  By way of example, the Department of Veterans Affairs

informed the Commonwealth in clear terms that the federal government is entitled to "recapture"

millions in federal grants if and when the Commonwealth opts to bury the same-sex spouse of a

veteran in one of the state veterans cemeteries, a threat which, in essence, would penalize the

Commonwealth for affording same-sex married couples the same benefits as similarly-situated

heterosexual couples that meet the criteria for burial in Agawam or Winchendon.  Accordingly,

this court finds that DOMA induces the Commonwealth to violate the equal protection rights of

its citizens.

And so, as DOMA imposes an unconstitutional condition on the receipt of federal funding,

this court finds that the statute contravenes a well-established restriction on the exercise of

Congress' spending power.  Because the government insists that DOMA is founded in this federal

power and no other, this court finds that Congress has exceeded the scope of its authority.

Having found that DOMA imposes an unconstitutional condition on the receipt of federal

---

[141]<u>Gill et al. v. Office of Pers. Mgmt. et al.</u>, No. 09-cv-10309-JLT (D. Mass. July 8, 2010)
(Tauro, J.).

funding, this court need not reach the question of whether DOMA is sufficiently related to the specific purposes of Medicaid or the State Cemetery Grants Program, as required by the third limitation announced in <u>Dole</u>.

       2.    <u>DOMA Impermissibly Interferes with the Commonwealth's Domestic Relations Law</u>

That DOMA plainly intrudes on a core area of state sovereignty—the ability to define  the marital status of its citizens—also convinces this court that the statute violates the Tenth Amendment.

In <u>United States v. Bongiorno</u>, the First Circuit held that "a Tenth Amendment attack on a federal statute cannot succeed without three ingredients: (1) the statute must regulate the States as States, (2) it must concern attributes of state sovereignty, and (3) it must be of such a nature that compliance with it would impair a state's ability to structure integral operations in areas of traditional governmental functions."[142]

       A.    <u>DOMA Regulates the Commonwealth "as a State"</u>

With respect to the first prong of this test, the Commonwealth has set forth a substantial amount of evidence regarding the impact of DOMA on the state's bottom line.  For instance, the government has announced that it is entitled to recapture millions of dollars in federal grants for state veterans' cemeteries at Agawam and Winchendon should the same-sex spouse of a veteran

---

[142]106 F.3d 1027, 1033 (1st Cir. 1997) (citations and internal quotation marks omitted) (quoting <u>Hodel v. Virginia Surface Mining & Reclam. Ass'n, Inc.</u>, 452 U.S. 264, 287-88 (1981)); <u>Z.B. v. Ammonoosuc Cmty. Health Servs.</u>, 2004 U.S. Dist. LEXIS 13058, at *15 (D. Me. July 13, 2004).

be buried there.  And, as a result of DOMA's refusal to recognize same-sex marriages, DOMA

directly imposes significant additional healthcare costs on the Commonwealth, and increases the

state's tax burden for healthcare provided to the same-sex spouses of state employees.[143]  In light

of this evidence, the Commonwealth easily satisfies the first requirement of a successful Tenth

Amendment challenge.

B.    Marital Status Determinations Are an Attribute of State
Sovereignty

Having determined that DOMA regulates the Commonwealth "as a state," this court must

now determine whether DOMA touches upon an attribute of state sovereignty, the regulation of

marital status.

"The Constitution requires a distinction between what is  truly national and what is truly

local."[144]  And, significantly, family law, including "declarations of status, e.g. marriage,

annulment, divorce, custody and paternity,"[145] is often held out as the archetypal area of local

concern.[146]

---

[143]The government contends that additional federal income and Medicare tax withholding requirements do not offend the Tenth Amendment because they regulate the Commonwealth not as a state but as an employer.  It is clear that the Commonwealth has standing to challenge DOMA's interference in its employment relations with its public employees, Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. 41, 51 n.17 (1986), and this court does not read the first prong of the Bongiorno test so broadly as to preclude the Commonwealth from challenging this application of the statute.

[144]Morrison, 529 U.S. at 618 (citing Lopez, 514 U.S. at 568).

[145]Ankenbrandt v. Richards, 504 U.S. 689, 716 (1992) (Blackmun, J., concurring).

[146]See, e.g., Boggs v. Boggs, 520 U.S. 833, 848 (1997) ("As a general matter, 'the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.'") (citation omitted); Haddock v. Haddock, 201 U.S. 562, 575 (1906) ("No one denies that the States, at the time of the adoption of the

29

The Commonwealth provided this court with an extensive affidavit on the history of marital regulation in the United States, and, importantly, the government does not dispute the accuracy of this evidence.  After weighing this evidence, this court is convinced that there is a historically entrenched tradition of federal reliance on state marital status determinations.  And, even though the government objects to an over-reliance on the historical record in this case,[147] "a longstanding history of related federal action...can nonetheless be 'helpful in reviewing the substance of a congressional statutory scheme,' and, in particular, the reasonableness of the relation between the new statute and pre-existing federal interests."[148]

State control over marital status determinations is a convention rooted in the early history of the United States, predating even the American Revolution.  Indeed, the field of domestic relations was regarded as such an essential element of state power that the subject of marriage was not even broached at the time of the framing of the Constitution.  And, as a consequence of continuous local control over marital status determinations, what developed was a checkerboard of rules and restrictions on the subject that varied widely from state to state, evolving throughout American history.  Despite the complexity of this approach, prior to DOMA, every effort to establish a national definition of marriage met failure, largely because politicians fought to guard

---

Constitution, possessed full power over the subject of marriage and divorce [and that] the Constitution delegated no authority to the Government of the United States on [that subject]."), overruled on other grounds, Williams v. North Carolina, 317 U.S. 287 (1942); see also Morrison, 529 U.S. at 616.

[147]Defs.' Reply Mem., 4-5 ("a history of respecting state definitions of marriage does not itself mandate that terms like 'marriage' and 'spouse,' when used in federal statutes, yield to definitions of these same terms in state law.") (emphasis in original).

[148]United States v. Comstock, 176 L. Ed. 2d 878, 892 (2010) (internal citations omitted).

their states' areas of sovereign concern.

The history of the regulation of marital status determinations therefore suggests that this area of concern is an attribute of state sovereignty, which is "truly local" in character.

That same-sex marriage is a contentious social issue, as the government argues, does not alter this court's conclusion.  It is clear from the record evidence that rules and regulations regarding marital status determinations have been the subject of controversy throughout American history.  Interracial marriage, for example, was at least as contentious a subject.  But even as the debate concerning interracial marriage waxed and waned throughout history, the federal government consistently yielded to marital status determinations established by the states.  That says something.  And this court is convinced that the federal government's long history of acquiescence in this arena indicates that, indeed, the federal government traditionally regarded marital status determinations as the exclusive province of state government.

That the Supreme Court, over the past century, has repeatedly offered family law as an example of a quintessential area of state concern, also persuades this court that marital status determinations are an attribute of state sovereignty.[149]  For instance, in Morrison, the Supreme Court noted that an overly expansive view of the Commerce Clause could lead to federal legislation of "family law and other areas of traditional state regulation since the aggregate effect

---

[149]See, e.g., Lopez, 514 U.S. 549, 564 (1995) (noting with disfavor that a broad reading of the Commerce Clause could lead to federal regulation of "family law (including marriage, divorce and child custody)"); Ankenbrandt v. Richards, 504 U.S. 689, 703 (1992); Haddock, 201 U.S. at 575 ("No one denies that the States, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce [and that] the Constitution delegated no authority to the Government of the United States on [that subject]."); see also, United States v. Molak, 276 F.3d 45, 50 (1st Cir. 2002) ("[d]omestic relations and family matters are, in the first instance, matters of state concern").

of marriage, divorce, and childrearing on the national economy is undoubtedly significant."[150]

Similarly, in <u>Elk Grove Unified Sch. Dist. v. Newdow</u>, the Supreme Court observed "that '[t]he

whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws

of the States and not to the laws of the United States.'"[151]

The government has offered little to disprove the persuasive precedential and historical

arguments set forth by the Commonwealth to establish that marital status determinations are an

attribute of state sovereignty.[152]  The primary thrust of the government's rebuttal is, in essence,

that DOMA stands firmly rooted in Congress' spending power, and, for that reason, "the fact that

Congress had not chosen to codify a definition of marriage for purposes of federal law prior to

1996 does not mean that it was without power to do so or that it renders the 1996 enactment

invalid."[153]  Having determined that DOMA is not rooted in the Spending Clause, however, this

court stands convinced that the authority to regulate marital status is a sovereign attribute of

---

[150]529 U.S. at 615 (emphasis added).

[151]542 U.S. 1, 12 (2004) (quoting <u>In re Burrus</u>, 136 U.S. 586, 593 (1890)) (other citations omitted).

[152]Certain immigration cases cited by the government do not establish, as it contends, that "courts have long recognized that federal law controls the definition of 'marriage' and related terms."  Defs.' Reply Mem., 5.  None of these cases involved the displacement of a state marital status determination by a federal one.  <u>Adams v. Howerton</u>, 673 F.2d 1036 (9th Cir. 1982), for instance, involved a challenge by a same-sex spouse to the denial of an immigration status adjustment.  Because this case was decided before any state openly and officially recognized marriages between individuals of the same sex, as the Commonwealth does here, <u>Adams</u> carries little weight.  And, in <u>Lockhart v. Napolitano</u>, 573 F.3d 251 (6th Cir. 2009), and <u>Taing v. Napolitano</u>, 567 F.3d 19 (1st Cir. 2009), the courts merely determined that it would be unjust to deny the adjustment of immigration status to surviving spouses of state-sanctioned marriages solely attributable to delays in the federal immigration process.

[153]Defs.' Reply Mem., 5.

statehood.

       C.     <u>Compliance with DOMA Impairs the Commonwealth's  Ability to Structure Integral Operations in Areas of Traditional Governmental Functions</u>

Having determined that marital status determinations are an attribute of state sovereignty, this court must now determine whether compliance with DOMA would impair the Commonwealth's ability to structure integral operations in areas of traditional governmental functions.[154]

This third requirement, viewed as the "key prong" of the Tenth Amendment analysis, addresses "whether the federal regulation affects basic state prerogatives in such a way as would be likely to hamper the state government's ability to fulfill its role in the Union and endanger its

---

[154]<u>United Transp. Union v. Long Island R. R. Co.</u>, 455 U.S. 678, 684 (1982) (citations and quotation marks omitted).  It is worth noting up front that this "traditional government functions" analysis has been the subject of much derision.  Indeed, this rubric was once explicitly disavowed by the Supreme Court in the governmental immunity context in <u>Garcia v. San Antonio Metro. Transit Auth.</u>, 469 U.S. 528 (1985), in which the Court stated that the standard is not only "unworkable but is also inconsistent with established principles of federalism."  <u>Id.</u> at 531, <u>see also</u> <u>United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.</u>, 550 U.S. 330, 368-369 (2007) (noting that legal standards hinging on "judicial appraisal[s] of whether a particular governmental function is 'integral' or 'traditional'" were "abandon[ed] ... as analytically unsound") (Alito, J., dissenting).

Still, it is this court's understanding that such an analysis is nonetheless appropriate in light of more recent Supreme Court cases, <u>see, e.g.,</u> <u>New York</u>, 505 U.S. at 159 (noting that the Tenth Amendment challenges "discern[] the core of sovereignty retained by the States"), and <u>Morrison</u>, 529 U.S. at 615-16, which revive the concept of using the Tenth Amendment to police intrusions on the core of sovereignty retained by the state.  Moreover, this analysis is necessary, in light of First Circuit precedent, which post-dates the Supreme Court's disavowal of the traditional governmental functions analysis in <u>Garcia</u>.  <u>Bongiorno</u>, 106 F.3d at 1033.

separate and independent existence."[155]  And, in view of more recent authority, it seems most

appropriate for this court to approach this question with a mind towards determining whether

DOMA "infring[es] upon the core of state sovereignty."[156]

Tenth Amendment caselaw does not provide much guidance on this prong of the analysis.

It is not necessary to delve too deeply into the nuances of this standard, however, because the

undisputed record evidence in this case demonstrates that this is not a close call.  DOMA set the

Commonwealth on a collision course with the federal government in the field of domestic

relations.  The government, for its part, considers this to be a case about statutory interpretation,

and little more.  But this case certainly implicates more than tidy questions of statutory

interpretation, as the record includes several concrete examples of the impediments DOMA places

on the Commonwealth's basic ability to govern itself.

First, as a result of DOMA, the VA has directly informed the Commonwealth that if it

opts to bury same-sex spouses of veterans in the state veterans' cemeteries at Agawam and

Winchendon, the VA is entitled to recapture almost $19 million in federal grants for the

construction and maintenance of those properties.  The Commonwealth, however, recently

approved an application for the burial of Thomas Hopkins, the same-sex partner of Darrel

---

[155]United Transp. Union v. Long Island R. R. Co., 455 U.S. 678, 686-687 (1982) (internal citations and quotation marks omitted).  This court notes that the concept of "traditional governmental functions" has been the subject of disfavor, see, e.g., Morrison, 529 U.S. 598, 645-52 (2000) (describing this part of the test as "incoherent" because there is "no explanation that would make sense of the multifarious decisions placing some functions on one side of the line, some on the other") (Souter, J., dissenting), but was revived by the court in Morrison.

[156]New York, 505 U.S. at 177.  It is also important to note that in recent history, Tenth Amendment challenges have largely policed the federal government's efforts to "commandeer" the processes of state government.  Here, however, the Commonwealth  acknowledges that "this is not a commandeering case."  Pl.'s Mem. Supp. Summ. Judg., 22.

Hopkins, in the Winchendon cemetery, because the state constitution requires that the Commonwealth honor their union.  The Commonwealth therefore finds itself in a Catch-22: it can afford the Hopkins' the same privileges as other similarly-situated married couples, as the state constitution requires, and surrender millions in federal grants, or deny the Hopkins' request, and retain the federal funds, but run afoul of its own constitution.

Second, it is clear that DOMA effectively penalizes the state in the context of Medicaid and Medicare.

Since the passage of the MassHealth Equality Act, for instance, the Commonwealth is required to afford same-sex spouses the same benefits as heterosexual spouses. The HHS Centers for Medicare & Medicaid Services, however, has informed the Commonwealth that the federal government will not provide federal funding participation for same-sex spouses because DOMA precludes the recognition of same-sex couples.  As a result, the Commonwealth has incurred at least $640,661 in additional costs and as much as $2,224,018 in lost federal funding.

In the same vein, the Commonwealth has incurred a significant additional tax liability since it began to recognize same-sex marriage in 2004 because, as a consequence of DOMA,  health benefits afforded to same-sex spouses of Commonwealth employees must be considered taxable income.

That the government views same-sex marriage as a contentious social issue cannot justify its intrusion on the "core of sovereignty retained by the States,"[157] because "the Constitution ... divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of

---

[157]New York, 505 U.S. at 159.

the day."[158]  This court has determined that it is clearly within the authority of the Commonwealth

to recognize same-sex marriages among its residents, and to afford those individuals in same-sex

marriages any benefits, rights, and privileges to which they are entitled by virtue of their marital

status.  The federal government, by enacting and enforcing DOMA, plainly encroaches upon the

firmly entrenched province of the state, and, in doing so, offends the Tenth Amendment.  For that

reason, the statute is invalid.

IV.     Conclusion

        For the foregoing reasons, Defendants' Motion to Dismiss is DENIED and Plaintiff's

Motion for Summary Judgment is ALLOWED.

AN ORDER HAS ISSUED.


                                                    /s/ Joseph L. Tauro
                                                 United States District Judge

---

[158]Id. at 187.